1

2    WO

3

4

5

6                    IN THE UNITED STATES DISTRICT COURT

7                     FOR THE DISTRICT OF ARIZONA

8

9    Peter Wickramasekera,                )    No. CV 09-449-TUC-HCE
                                           )
10              Plaintiff,                 )    **ORDER**
                                           )
11   vs.                                   )
                                           )
12                                         )
     Michael J. Astrue, Commissioner of the)
13   Social Security Administration,       )
                                           )
14              Defendant.                 )
                                           )
15   _____)

16

17

18         Plaintiff has filed the instant action seeking review of the final decision of the

19   Commissioner of Social Security pursuant to 42 U.S.C. § 405(g). The Magistrate Judge has

     jurisdiction over this matter pursuant to the parties' consent. *See* 28 U.S.C. § 636(c).
20
           Pending before the Court are Plaintiff's Opening Brief (Doc. 18) (hereinafter
21
     "Plaintiff's Brief"), Defendant's Opposition to Plaintiff's Opening Brief (Doc. 19)
22
     (hereinafter "Defendant's Opp."), and Plaintiff's Reply Brief (Doc. 20) (hereinafter
23
     "Plaintiff's Reply").  For the following reasons, the Court remands this matter for further
24
     proceedings.
25
     I.    PROCEDURAL HISTORY
26
           On July 21 2006, Plaintiff protectively filed with the Social Security Administration
27
     (hereinafter "SSA") an application for disability insurance benefits under Title II and Title
28

XVI of the Social Security Act alleging inability to work since September 15, 2003 due to panic attacks and anxiety attacks. (TR. 19, 61-65, 93, 99). Plaintiff's application was denied initially and on reconsideration. (TR. 32-35, 45-48, 52-55).

Plaintiff then requested a hearing before an administrative law judge. (TR 44). The matter was set for hearing on July 24, 2007 before Administrative Law Judge (hereinafter "ALJ") Norman R. Buls. (TR 26-29; *see also* TR. 429-43). At the July 24, 2007 hearing Plaintiff, who was represented by counsel, testified before the ALJ. (TR. 429-43). On November 20, 2007, the ALJ denied Plaintiff's claim. (TR. 19-25). The Appeals Council subsequently denied Plaintiff's request for review thereby rendering the ALJ's November 20, 2007 decision the final decision of the Commissioner. (TR. 4-6). Plaintiff then initiated the instant action.

II.     THE RECORD ON APPEAL

A.     Plaintiff's general background and Plaintiff's statements in the record

Plaintiff was born on June 29, 1960. (TR. 432). In approximately 2001, Plaintiff's girlfriend of 11 years moved away with her two-year old daughter whom he helped raise since the child was an infant.[1] (TR. 132; *see also* TR. 132). At the time of the hearing, Plaintiff had never been married and he lived with his mother and brother. (TR. 432-33, 437).

Plaintiff is a high school graduate. (TR. 432). In the 1970's, when Plaintiff was 18 or 19 years of age, he served in the military for 18 months and during that time he was raped and stabbed. (TR. 422, 434; *see also* Plaintiff's Brief, pp.2-3; Defendant's Opp., p.2). He received an honorable discharge. (TR. 434). It is undisputed that before and during the period at issue, Plaintiff received treatment at Veterans Administration (hereinafter "VA") facilities for, *inter alia,* major depressive disorder, anxiety, and PTSD. (*See* Plaintiff's Brief, pp.2-3; Defendant's Opp., p.2).

---

[1]Plaintiff is not the child's biological father. (TR. 132).

1       Plaintiff has "tried to work jobs that allowed me not to work around people much."

2   (TR. 94).   From 1995 to 1998, Plaintiff was employed as a "wood worker and delivery

3   perso[n]."   (TR. 86).   Thereafter, he worked as a pizza delivery driver from 2000 to

4   September 15, 2003.  (*Id.*). He left that job when he was terminated because his employer

5   discontinued pizza delivery.  (TR. 93, 435).   Plaintiff did not look for other work because "I

6   had an incident with my sister getting in trouble and then I just started getting anxiety attacks

7   more frequently after a family problem."  (TR. 435).   According to Plaintiff, his ability to

8   work is limited by panic attacks and anxiety attacks which occur when he is around strangers,

9   in a public place, or has to leave his home.   (TR. 93, 435).   When Plaintiff experiences an

10   anxiety attack his "chest hurts and I just feel for some reason like something–some

11   impending doom like something is going to happen that I won't be able to control or I just–I

12   don't know, it's hard to explain. I just...get a real bad chest pain and I just get scared having

13   to leave the house." (TR. 435-36). Otherwise, Plaintiff's condition does not cause pain.  (TR.

14   93). Plaintiff does not believe that there are any jobs that he is capable of performing.  (TR.

15   441).

16       Plaintiff also has difficulty sleeping and has nightmares.  (TR. 440).

17       Plaintiff also testified about going to work at the pizza business and discovering that

18   three men "had the female manager in the bathroom and were attempting to rape her and they

19   came up and told me to open the safe.  I tried to explain to them that being a driver I didn't

20   even have access to the cash register."  (TR. 438).

21       On a typical day, Plaintiff rises about 8:00 a.m. and makes breakfast for his mother.

22   (TR. 436).  He might do some gardening and then he watches television for "[p]robably more

23   than eight hours."  (*Id.*).  He also makes lunch for his mother, does laundry and washes the

24   dishes.  (*Id.*).  He does not go to the grocery store unless he "absolutely..." has to.  (*Id.*).  He

25   does not visit with friends or relatives, other than his mother and brother with whom he lives,

26   and he does not go online on the computer.  (TR. 436-37).

27       Plaintiff takes Mirtazapine and Citalopram, and he occasionally takes Trazodone to

28   help him sleep. (TR. 438, 440).  Plaintiff's medications make him feel lethargic and he does

1   not believe they help him. (TR. 439).  He testified that he had not smoked marijuana or

2   imbibed alcohol for "more than 19 months and really have no desire to, to go back at it."

3   (TR. 441).

4          Plaintiff testified that he had taken the bus to get to the hearing.  (TR. 433).

5          B.      Medical Evidence Before the ALJ

6                  1.      Treating Physicians

7          On October 1, 2003, Plaintiff was hospitalized overnight when he presented to Scott

8   Freeman, M.D., at the VA hospital, with complaints of depression and suicidal ideation.

9   (TR. 130-35).   Plaintiff also complained of "occasional severe anxiety consisting of chest

10  pain, tremors, and a sense of 'impending doom.'" (TR. 131).  He reported poor sleep, loss

11  of appetite, anxiety, frequent crying spells, and self-destructive thoughts.  (*Id.*).  He stated

12  that he had been "somewhat mildly depressed" for the past two years, and that his depression

13  worsened in the last two weeks citing "several stressors..." including "his sister being raped,

14  his mother having coronary artery surgery, his dog dying, and missing his daughter who

15  moved to Texas 2 yrs ago with his former girlfriend."  (*Id.; see also* TR. 311 (in 2005

16  Plaintiff stated that "for years he has slept with his dog and a knife by his bed for safety but

17  since his dog died he has begun locking his bedroom door")).

18         Plaintiff was well-groomed and slight tremor and agitation were noted.  (TR.  132).

19  He presented with normal speech, dysphoric affect, and depressed mood.  (TR. 133).  He had

20  no hallucinations, was oriented to time, place, and situation and his memory was intact.  (*Id.*).

21  His intelligence was average, and his attention, concentration, insight, and judgment were

22  good.  (*Id.*).  Dr. Freeman opined that Plaintiff was

23         in the midst of his first major depressive episode.  In addition he is a binge
           drinker who has been abusing alcohol more now since he has been depressed.
24         He also meets criteria for marijuana abuse and benzodiazepine abuse....It is
           likely that the depression he was experiencing over the past 2 years has been
25         dysthymia that was precipitated by the loss of his "daughter[]" [when
           Plaintiff's girl friend moved away with her child].  His current depression is
26         superimposed on the dysthymia, otherwise known as "double depression."

27  (Id.).  Dr. Freemen felt that Plaintiff would benefit most from an antidepressant, "SATP

28  treatment," and outpatient individual psychotherapy.  (*Id.*).  Plaintiff was diagnosed with

1   "Major Depressive Disorder (single episode, severe), Dysthymia, Alcohol Abuse, Marijuana

2   Abuse, Benzodiazepine Abuse." (TR. 131). Plaintiff's Global Assessment of Functioning

3   (hereinafter "GAF") score was 25.[2] (*Id.*). It was also noted that Plaintiff had been previously

4   assessed with the following GAF scores: 50 in September 1999; 65 in October 1999; and 50

5   in June 2003. (*Id.*). Plaintiff's highest GAF score in the past year was 65. (*Id.*).

6       After indicating that Plaintiff was not a danger to himself or others and that he

7   reported feeling better, Plaintiff was discharged on October 2, 2003 with prescriptions for

8   Escitalopram and Trazodone and a follow-up appointment was scheduled  with the mental

9   health clinic. (TR. 134-35). Prior to discharge, Plaintiff stated that "yesterday was an

10  unusual day for him and that he has been functioning for a long time with his problems and

11  would do well." (TR. 134).

12      The record does not contain mental health treatment notes for the period between

13  October 2003 and March 2005, however, later records reflect that Plaintiff was assessed with

14  a GAF score of 55 in May of 2004, 50 in September 2004, and 55 in November 2004.

15  (Defendant's Opp., p. 4; TR. 313).

16      On March 3, 2005, Psychologist Michael K. Gann, Ph.D., of the VA, completed a

17  Mental Health Clinic Consult report. (TR. 311-14). Plaintiff complained of depression,

18  frequent panic attacks, flashbacks, dissociative episodes, exaggerated startle response,

19

20  _____

21      [2]GAF Scores range from 1-100. American Psychiatric Association, *Diagnostic and Statistical Manual of Mental Disorders*, p.32 (4th ed. 1994) (hereinafter "*DSM-IV*"). In arriving at a GAF Score, the clinician considers psychological, social, and occupational

22  functioning on a hypothetical continuum of mental health illness. *Id.* Impairments in

23  functioning due to physical or environmental limitations are not included. *Id.* A GAF between 21 and 30 indicates the individual's behavior is considerably influenced by

24  delusions or hallucinations, or that the individual has serious impairment in communication

25  or judgment (e.g., sometimes incoherent, acts grossly inappropriately, suicidal preoccupation) or inability to function in almost all areas (e.g., stays in bed all day; no job,

26  home, or friends). *Id.* Defendant opines that the GAF score of 25 in October 2003 "may be

27  a typographical error in light of the remainder of the report and the quick nature of Plaintiff's psychiatric discharge." (Defendant's Opp., p. 4 n.5). Plaintiff has not disputed Defendant's

28  assertion.

1    nightmares, and both labile emotions and emotional numbing. (TR. 311). Plaintiff also

2    reported that he had been binge drinking until January 3, 2005 in order to sleep. (*Id.*). When

3    telling Dr. Gann about his family history, Plaintiff reported that his sister was dependent on

4    crack and had attempted suicide multiple times, and his brother had been diagnosed with

5    "schizoaffective disorder" and had been missing for several years. (TR. 311-12). He told Dr.

6    Gann that one year ago he had been hospitalized "when his sister was raped..." and he "'went

7    after the guy and police stopped me. Trigger[ed] what happened to me.'"[3] (TR. 311).

8         Plaintiff also related that during his last job as a pizza delivery driver, "he had been

9    robbed five times, the last time he was forced into a closet at gunpoint. He stated that he had

10   no emotional response during or after that robbery. He lost his job and has not been able to

11   work since." (*Id.*).

12        Dr. Gann noted that Plaintiff was well-groomed, his speech was normal, his affect

13   labile, his mood dysthymic, his thought processes were normal, logical and goal directed, and

14   his thought content was normal. (*Id.*). Dr. Gann also noted that Plaintiff's memory was

15   intact, intelligence was above average, and his attention, concentration, insight, and judgment

16   were good. (TR. 313). Dr. Gann's impression was that Plaintiff had "PTSD, major

17   depression, panic disorder and growing isolation. Intermittent binge drinking and sleep

18   disorder, and unable to work." (*Id.*). Dr. Gann opined that Plaintiff's symptoms were

19   worsening related to stress and depression. (*Id.*). Dr. Gann's diagnosis was: "PTSD, M[ajor]

20   D[epressive] D[isorder] recurrent, moderate severity, Alcohol Abuse in remission" and

21   "Problems with: Occupational, Economic, Family." (*Id.*). Dr. Gann assessed a GAF score

22   of 50. (*Id.*). Dr. Gann's treatment plan included "[e]xposure, cognitive restructuring, and

23   supportive therapy." (*Id.*).

24        On April 7, 2005, Plaintiff presented for a follow-up appointment with Dr. Gann

25   complaining of feeling lethargic, difficulty falling asleep, and feeling no motivation to leave

26

27        [3]The record reflects that Plaintiff was hospitalized in 2003. (TR. 130-35). Plaintiff's
     statements in the record support the conclusion that he was referring to this hospital stay
28   when talking to Dr. Gann. (*See* TR. 232).

his home. (TR. 308). He continued to suffer from panic attacks and nightmares. (*Id.*). Plaintiff was well groomed and had good hygiene. (TR. 308). His mental status examination findings were unchanged from his March 3, 2005 appointment with Dr. Gann. (TR. 308-09). Dr. Gann diagnosed moderate depression. (TR. 309).

On April 29, 2005, Plaintiff presented to Dr. Gann complaining of inability to sleep, hypervigilance, and exaggerated startle response. (TR. 307). He appeared "haggard and fatigued." (*Id.*).

On May 18, 2005, Plaintiff reported to Dr. Gann that he had not been sleeping "'at all' because of hypervigilance" and discussed getting "a guard dog so that he will feel safe enough to sleep." (TR. 304). Plaintiff also reported that his home had been burglarized (*Id.*; *see also* TR. 203 (Plaintiff recounted that "he was robbed at gunpoint....Thought [he] was going to be killed but then struck over head with gun.")). Plaintiff told Dr. Gann that his mother had "been staying away. He believes his sister is 'filling her head with lies about my friends' but [Plaintiff]...admitted he has brought homeless people to the home to 'give them a hand.'" (TR. 304). Plaintiff said that he had been involved in a conflict with someone at a bar who called him "son." (*Id.*). Plaintiff had also received a traffic ticket for driving without his license. (*Id.*). Dr. Gann noted that Plaintiff was "poorly groomed, poor hygiene, offensive odor, unkempt appearance" and that Plaintiff looked despondent and generally fatigued. (*Id.*). While Plaintiff's behavior was normal, his affect was depressed and his mood dysthymic. (*Id.*). Dr. Gann also indicated that Plaintiff's attention, concentration, insight, and judgment were poor. (TR. 305). Dr. Gann diagnosed depression stating that Plaintiff "appears more depressed and fatigued with every visit." (*Id.*). He opined that Plaintiff would not benefit from therapy without medication. (*Id.*).

On May 18, 2005, Plaintiff saw John J. Witek, M.D., for supportive therapy and medication management at the request of Dr. Gann. (TR. 301). Plaintiff reported that he had not slept well the previous night because he had gone to pick up a friend who was too drunk to drive and Plaintiff did so knowing his own license was suspended. (TR. 302). While helping his friend, Plaintiff was stopped by police and was found to be driving on a

1   suspended license and without insurance.  (*Id.*).  Plaintiff also reported that his home had

2   been recently burglarized. (*Id.*).  Dr. Witek noted that Plaintiff's appearance was "casual,

3   dishevelled,  tired, carrying papers, electronics". (*Id.*).  According to Dr. Witek, Plaintiff's

4   mood was euthymic and his thought content was normal.  (*Id.*). However, Dr. Witek

5   indicated that Plaintiff's insight was limited and his judgment was poor given that he elected

6   to drive on a suspended license and without insurance. (TR. 302-03).  Dr. Witek assessed

7   a GAF score of 50 and diagnosed: "Depressive d/o, Alc/Marij abuse/dependence; presumpt

8   PTSD sec MST."  (TR. 300, 303).

9        Plaintiff saw Dr. Witek again on May 20, 2005 complaining of difficulty sleeping,

10   depression, and loss of appetite resulting in weight loss. (TR. 299). Plaintiff also complained

11   of legal problems and other stressors. (TR. 301). Dr. Witek noted Plaintiff's appearance was

12   "casual, dishevelled, more alert, carrying papers on clipboard in some disarray." (TR. 299).

13   Plaintiff was talkative, interactive, smiled at times and maintained good eye contact.  (TR.

14   299-300).   Plaintiff's affect was normal, his mood depressed and his thought process and

15   content were normal. (TR. 300). Dr. Witek found that Plaintiff's insight was limited and his

16   judgment poor.  (*Id.*).  He assessed a GAF score of 50.  (TR. 179).  Dr. Witek noted that

17   Plaintiff's report of depressive symptoms was incongruent with his affect and, consequently,

18   Plaintiff was "[s]omewhat difficult to assess."  (TR. 300).  His diagnosis was: "Depressive

19   d/o; Alc/Marij abuse/dependence; Anxiety d/o NOS, r/o PTSD sec MST." (TR. 301). He

20   prescribed a trial of  Mirtazapine, an antidepressant, and that Plaintiff continue seeing Dr.

21   Gann for individual therapy.  (*Id.*).

22        On May 25, 2005, Dr. Witek noted that Plaintiff's appearance was less dishevelled

23   than prior visits and that his behavior, affect, thought process and thought content were

24   normal.  (TR. 297-98).  Plaintiff's  mood  was  "mild  dysphoria"  but  was  "somewhat

25   improved."   (*Id.*).  Plaintiff's  attention  and  concentration  were  good,  his  insight  and

26   judgment were fair and his memory intact.  (*Id.*).

27        Plaintiff saw Dr. Witek again on August 3, 2005 and reported that he had missed

28   several appointments because of a number of problems including that he had been robbed at

gunpoint; his brother who had been missing for over three and one-half years after wandering away from a group home was found dead and Plaintiff had to identify the body; and his sister attempted suicide. (TR. 203). Plaintiff told Dr. Witek that the Mirtazapine was not helpful and he had not refilled the prescription. (*Id.*). Plaintiff appeared casual, dishevelled and alert. (*Id.*). He was talkative, interactive, and smiled at times. (*Id.*). His affect and mood were mildly labile, his thought process was rambling and circumstantial, and his thought content was good. (*Id.*). He was oriented, his attention and concentration were good, his insight was limited and his judgment was poor. (TR. 204). Dr. Witek diagnosed: "Depressive d/o; Alc/Marij abuse/dependence; presumpt PTSD sec MST." (*Id.*) Dr. Witek assessed a GAF score of 60 (TR. 182). Dr. Witek discussed Plaintiff's "[p]oor compliance w[ith] med trial re Mirtaz" and stressed the importance of compliance. (TR. 204). Plaintiff indicated he wanted to try Mirtazapine again and that he would take it consistently. (*Id.*). Dr. Witek prescribed Mirtazapine and Trazodone. (TR. 204-05).

On November 9, 2005, Plaintiff telephoned Dr. Gann stating that he had to serve weekend jail time for driving without a license "but when he presented to the jail he had a panic attack." (TR. 184). Plaintiff requested a letter stating he had PTSD and recommending that he be placed on home arrest. (TR. 184-85). Dr. Gann referred Plaintiff to Dr. Witek. (TR. 185).

On November 17, 2005, Plaintiff reported to Dr. Witek that he was subject to weekend incarceration for DUI charges and before presenting to the jail, he took two Trazodone tablets hoping he would sleep through the weekend but the jail refused to admit him because he was "hopped up on drugs." (TR. 180). Plaintiff reported that he felt depressed and could not say for sure whether he benefitted from the Mirtazapine. (TR. 181). He had been abstaining from alcohol and marijuana but he still went to bars in the afternoons to shoot pool. (*Id.*). Plaintiff requested that Dr. Witek write a letter recommending he be assigned to house arrest. (TR. 180). Dr. Witek noted that Plaintiff's appearance was dishevelled and he was alert, talkative, interactive, smiled at times and made good eye contact. (TR. 181). Dr. Witek indicated that Plaintiff's mood was "still depressed", thought process was

1  circumstantial and his thought content was normal. (*Id.*).  He was oriented and had good

2  attention and concentration but his insight was limited and his judgment poor.  (*Id.*).  Dr.

3  Witek continued Plaintiff on Trazodone and increased the dosage for Mirtazapine.  (TR.

4  182).  Dr. Witek also wrote a letter indicating that Plaintiff was being treated for

5  "presumptive Post-Traumatic Stress Disorder (PTSD) secondary to a sexual assault while on

6  active-duty military service.  He also has Depressive Disorder NOS as well as Alcohol and

7  Cannabis Abuse/Dependence."  (TR. 183).  Dr. Witek requested that house arrest be

8  considered because, given Plaintiff's history, incarceration with other males could lead to an

9  exacerbation of symptoms such as panic attacks.  (*Id.*).

10           On March 2, 2006, after missing two previous appointments, Plaintiff reported to Dr.

11  Witek that the letter was to no avail and he ended up serving five days in jail where he could

12  not sleep and suffered "'two bad panic attacks,' etc."  (TR. 177).  Plaintiff stated that he was

13  living with his mother, working odd jobs and that he had gotten a new dog for protection.

14  (TR. 178).  Plaintiff would go to the bar about half an hour before closing to play pool but

15  he was abstaining from alcohol and marijuana use.  (TR. 178-79).  He was still taking

16  Mirtazapine but was not sure if it was helping.  (TR. 178).  Dr. Witek found that Plaintiff

17  appeared dishevelled and alert, his affect was within the relatively normal range but he would

18  become "subdued for [a] short while [and his] voice soften[ed]" when he spoke about his

19  deceased brother.  (*Id.*).  Dr. Witek indicated that Plaintiff's mood was euthymic by

20  presentation, his thought process was circumstantial and his thought content were normal.

21  (*Id.*).  The remainder of the results of Plaintiff's mental status examination was good or

22  normal but for his insight which was limited and his judgment which was poor.  (TR. 178-

23  79).  Dr. Witek found that Plaintiff was "doing rel[atively] well, mood euthymic.  List of

24  ongoing stressors tho [sic] noted that affect rel[atively] non-congruent exc[ept] when

25  discussing deceased bro[ther]....Still struggling to stabilize life."  (TR. 179). Dr. Witek

26  assessed a GAF of 63.  (TR. 176).  Dr. Witek continued Plaintiff on Mirtazapine and

27  Trazodone and recommended that Plaintiff return to individual therapy with Dr. Gann.  (TR.

28  179).

In May 2006, Dr. Witek noted during a supportive therapy session that Plaintiff was "[n]ot doing well." (TR. 175). Plaintiff had been cited for a driving infraction and took the bus to his appointment with Dr. Witek. (*Id.*). Plaintiff's appearance was casual and he looked thin. (*Id.*). Plaintiff reported that he had "[n]o interest in doing anything," he did not get pleasure from things he used to enjoy, and he no longer had the desire to shoot pool or watch movies. (*Id.*). He stated that he had stopped drinking and using marijuana and that his appetite was down. (*Id.*). Dr. Witek indicated that Plaintiff's affect was normal and his mood was euthymic. (TR. 175-76). Dr. Witek found Plaintiff's thought process was circumstantial, his thought content was normal, his attention and concentration were good, his insight limited and his judgment poor. (TR. 176). Dr. Witek's diagnosis was "Depressive d/o, r/o MDD; Alc/Marij abuse/dependence, ?early remission; presumpt PTSD sec MST." (*Id.*) (question mark in original). Dr. Witek found that Plaintiff "[c]ontinues to be symptomatic. Litany of stressors." (*Id.*). Dr. Witek assessed a GAF of 55. (TR. 163). He also noted that Plaintiff had not been compliant with his medication and he informed Plaintiff that the medication must be taken on a regular basis. (TR. 176). Dr. Witek "[r]estart[ed] Mirtaz" and continued Plaintiff on Trazodone. (TR. 176-77).

Six months later, in November 2006, after missing two appointments, Plaintiff returned to see Dr. Witek and reported that this he was "really depressed during this time..." of year because it was the anniversary of his sister's death. (TR. 162). He also told Dr. Witek that he "mostly stay[ed] at home now," and had not been drinking alcohol or smoking marijuana except on his birthday when two girls talked him into going to a bar to shoot pool and he drank one fourth of a birthday beer. (*Id.*). He also said that on another night when he was at the bar, he gave a drunk patron a ride home upon the request of the bartender. (*Id.*). He had also spent two nights in jail, his dog had been reported as a dangerous animal, and he had filed a claim for SSDI but he had a conflict with his case manager. (TR. 162-63). Plaintiff stated he had not been compliant in taking Mirtazapine because it was too sedating. (TR. 162). Dr. Witek noted that Plaintiff's clothes were rumpled, dirty and had holes and that Plaintiff appeared thin. (TR. 163). Plaintiff was talkative, smiling and laughing at times,

1    interactive and maintained good eye contact. (*Id.*). Dr. Witek also noted that although

2    Plaintiff reported continuing depression, he appeared euthymic and that his affect, which was

3    within normal range, was incongruent. (TR. 163-64). Plaintiff was oriented and had good

4    concentration and attention. (TR. 163). Plaintiff's thought processes were "circumstantial,

5    overinclusive, rambling." (*Id.*). Dr. Witek found that Plaintiff's insight was limited noting

6    Plaintiff's "very inconsistent med compliance," and his judgment was poor. (*Id.*). Plaintiff

7    agreed to take Mirtazapine more consistently and Dr. Witek recommended that he take it at

8    night. (TR. 164). Dr. Witek also continued Plaintiff on Trazodone. (*Id.*).

9        On December 28, 2006, Plaintiff underwent psychiatric examination by John Clymer,

10    M.D., a psychiatrist at the VA. (TR. 135-39). Plaintiff requested that the door to the

11    examining room stay open during the examination and Dr. Clymer found this "interesting."

12    (TR. 136). Plaintiff stated that he had not suffered from psychiatric problems prior to going

13    into the military. (*Id.*). Plaintiff reported that his three siblings suffered from depression.

14    (*Id.*). Plaintiff said he had been raped while he was enlisted but he had no recall about the

15    rape other than the "assailant rubbing his bloodied knife in an X fashion on his right thigh."

16    (*Id.*). Dr. Clymer noted that "amnesia for the military sexual trauma is one of the criteria for

17    posttraumatic stress disorder." (*Id.*).

18        Plaintiff also told Dr. Clymer that he sleeps with a knife at his side and, once, when

19    his live-in girlfriend touched him while he was asleep, he jumped and held a knife to her

20    neck. (*Id.*). Dr. Clymer noted that Plaintiff experienced "a startle effect..." which is a

21    symptom of PTSD. (*Id.*). "Other symptoms of his [PTSD] are difficulty in falling asleep.

22    He also is very uncomfortable in social settings. There is some degree of hypervigilance."

23    (*Id.*). Plaintiff cited discomfort in crowds and when riding the bus he is "constantly on the

24    alert. He does feel safer in a public place rather than in a closed room with other males."

25    (*Id.*). Dr. Clymer also noted Plaintiff's symptoms of poor concentration and irritability.

26    (*Id.*).

27        Plaintiff reported that he had not used alcohol or illegal drugs for the past year or two.

28    (*Id.*).

Plaintiff had liked his former job delivering pizza

> because he was essentially delivering pizza and it was not necessary for him to interact with the public. This is another example of his discomfort in social settings. He was fired from that job because he refused to take on a managerial position at the pizza parlor. He states that during these last three years it has been harder and harder for him to be in a public place. He states, "I like to be off by myself."

(TR. 136-37). Prior to his work delivering pizza, Plaintiff worked for Hertz Rent-A-Car shuttling rental cars from one city to another. (TR. 137). "He liked it because he was not in contact with other people, but quit that when he was told he must change jobs at Hertz and start to deal with the public." (*Id.*).

Plaintiff identified the following symptoms of depression from which he currently suffers: "poor appetite [resulting in a 37-pound weight loss in the last two years], difficulty in getting to sleep, tearfulness, low self-esteem, poor concentration, no sex drive, no energy, and no interest in things have been present and unremitting. The frequency and duration of his depressive symptoms are unremitting." (TR. 137). According to Plaintiff, his only hospitalization in a psychiatric facility was about four years ago but he left the unit the following morning because he had to share his bedroom with other male patients. (*Id.; see also* TR. 136 ("about three years ago he was admitted to the psychiatric unit at this facility and had to share a bedroom with other males and he reports on that particular night he stayed awake all night")).

Dr. Clymer identified the following "exam specific indicators":

> the severity of his symptoms will be reflected in the GAF score [of 50]. The specific stressors during service and the link to current condition have to do with being hypervigilant, uncomfortable around other people, feeling unsafe when he has to share the bedroom with other male people.
> The adverse affects on employment have to do with his unwillingness to work with the the [sic] public.

(TR. 137; *see also* TR. 138 (for GAF score)). Dr. Clymer also noted that Plaintiff's report to Dr. Witek that he had no interest in doing anything including "shoot[ing] pool or the like..." is a symptom of depression. (TR. 138).

On mental status examination, Dr. Clymer found:

1
2
3
4
5

> There is no impairment of thought process nor communication. No delusions. No hallucinations. Good eye contact. No suicidal thoughts. He is not untidy in his personal appearance. He is oriented as to person, place, and time. No memory loss. No obsessive nor ritualistic behavior. Rate and flow of speech is normal. He is relevant and logical. He does report an occasional panic attack upon awakening and this is part of his symptomatology of his posttraumatic stress disorder. Mood is depressed. No impaired impulse control. The sleep impairment...is a part of the symptomatology of the posttraumatic stress disorder. No anxiety nor somatoform disorder.

6  (TR. 137-38). Dr. Clymer's diagnosis was: PTSD and "a major depression." (TR. 138). Dr.

7  Clymer assessed a GAF score for "a year ago at 50 with serious symptoms, serious

8  impairment in social and occupational function and I rate his global assessment of

9  functioning (GAF) this year at 50 for the same reasons."[4]  (*Id.*).  Dr. Clymer opined that

10  Plaintiff could manage VA benefits on his own. (*Id.*).

11       On February 1, 2007, Plaintiff presented to Dr. Witek "very upset..." and "worried..."

12  about his dog being impounded as a dangerous animal and he felt like he was being dealt

13  with unfairly. (TR. 148-49). Plaintiff wore rumpled dirty clothing with holes in his tee shirt.

14  (TR. 149). He was tense, angry and spoke fast in a loud voice much of the time. (*Id.*). His

15  affect was "congruent, agitated." (*Id.*). He was oriented, his attention and concentration

16  were good, insight was limited and judgment varied with his mood. (*Id.*). Dr. Witek

17  indicated that Plaintiff did not take Mirtazapine consistently and he infrequently took

18  Trazodone. (*Id.*). Dr. Witek's diagnosis was: "Depressive d/o; Alc/Marij abuse/dependence;

19  presumpt PTSD sec MST." (*Id.*). Dr. Witek assessed a GAF score of 50. (TR. 407). Dr.

20  Witek "[e]ncouraged..." Plaintiff to take 15 mg of Mirtazapine consistently. (TR. 150). Dr.

21  Witek noted that counseling might be considered again although Plaintiff "did not really

22  follow thru w/ this when attempted in past." (*Id.*). Dr. Witek arranged for a Care

23  Coordinator to call Plaintiff the next evening and the following week to check on how he was

24  doing. (*Id.*). The record also reflects that Dr. Witek wrote a letter "to whom it may concern"

25

26

---

27      [4]Dr. Clymer also stated: "Dr. Witek gave [Plaintiff]...a...[]GAF[] score [on] 11/17/05

28  of 55 and on 03/02/06 for 63. Please note that my...[]GAF[] score on this man is at 50 because he is unable to work." (TR. 138-39).

1  regarding the importance of Plaintiff's dog to him, noting that the "dog's presence helps

2  reduce [Plaintiff's]...nighttime anxiety." (TR. 152).

3      On March 23, 2007, Plaintiff saw Jane Gersmeyer, Psychiatric Clinical Nurse

4  Specialist, for medication management and supportive therapy. (TR. 413). He reported that

5  he was not sleeping well and that he took Percocet that the dentist had prescribed for him

6  along with the Mirtazapine to "'pass out'" in order to sleep. (*Id.*). He had no energy and did

7  not do anything other than cook and watch television. (*Id.*). He stated that he is either

8  depressed or angry. (*Id.*). Plaintiff stated that he had not had alcohol or drugs in over a year.

9  (*Id.*). Nurse Gersmeyer noted "tearfulness. Some feelings of hopelessness re situation with

10 his dog." (*Id.*). Plaintiff had poor eye contact and looked at the floor during most of the

11 appointment. (*Id.*). His thoughts were "obsessive re dog situation, difficult to redirect, no

12 hallucinations, no psychosis, no..." suicidal or homicidal ideation. (*Id.*). Nurse Gersmeyer

13 also indicated that Plaintiff "was inconsistent with information" and that he was not taking

14 Mirtazapine in a consistent manner.[5] (*Id.*). Her assessment was: "Depressive D/O NOS,

15 Personality D/O NOS." (*Id.*). She recommended that Plaintiff take Mirtazapine as

16 prescribed. (*Id.*).

17      When Plaintiff saw Dr. Witek again on May 1, 2007, he reported he was not sleeping

18 well and he continued to be upset and concerned that his dog was still impounded. (TR. 410-

19 11). Plaintiff also recounted to Dr. Witek that, in helping his sister move to Maryland, he

20 had driven with her to Indiana to see relatives and friends and he had a good time. (TR. 411).

21 Plaintiff reported that he was taking 15 mg of Mirtazapine, 30 mg was too sedating, and he

22 was uncertain whether the medication was helping his mood. (*Id.*). He denied using alcohol

23 or marijuana. (*Id.*). Dr. Witek noted that Plaintiff's appearance was slightly neater, he was

24 alert and thin. (*Id.*). Plaintiff was tense, upset, angry and maintained fairly good eye contact.

25 (*Id.*). His affect was congruent and his mood was angry. (*Id.*). Plaintiff's thought processes

26

27      [5]Plaintiff reported that he had been taking 30 mg, and sometimes 45 mg, of

28 Mirtazapine instead of 15 mg. (TR. 415).

1  were circumstantial and overinclusive and he remained focused on the situation with the dog

2  and a sense of being dealt with unfairly. (*Id.*). Plaintiff was oriented, his insight was limited,

3  his judgment varied with his mood, and his attention and concentration were good. (*Id.*). Dr.

4  Witek's diagnosis continued to be: "Depressive d/o; Alc/Marij abuse/dependence; presumpt

5  PTSD sec MST." (TR. 412). Dr. Witek noted that Plaintiff was taking Mirtazapine "but

6  overly sedating at 30mg/d dose." (*Id.*). Dr. Witek prescribed 22.5 mg of Mirtazapine. (*Id.*).

7  Plaintiff was to follow up with Nurse Gersmeyer in 3 weeks and with Dr. Witek in 8 weeks.

8  (*Id.*).

9  On May 30, 2007, Plaintiff saw Nurse Gersmeyer for medication management and

10  supportive therapy. (TR. 409). Plaintiff remained upset about the situation with his dog and

11  reported he was not sleeping and he sometimes took 30 mg of Mirtazapine to sleep. (*Id.*).

12  Nurse Gersmeyer's assessment was: "Depressive D/O NOS, Anxiety State." (TR. 410).

13  On June 28, 2007, Plaintiff saw Dr. Witek. (TR. 406). Plaintiff reported that he could

14  not tolerate an increased Mirtazapine dosage because it made him too sedated in the morning

15  and it did not help him sleep at night. (*Id.*). Plaintiff remained consumed by the situation

16  with his dog and sense of being dealt with unfairly. (TR. 406-07). His appearance was neat,

17  he was alert and interactive, smiled and maintained good eye contact. (TR. 406). Dr. Witek

18  noted that Plaintiff spoke rapidly, his mood was frustrated and angry and his affect was

19  relatively "full range, somewhat incongruent, no signif[icant] lability." (*Id.*). Plaintiff's

20  thought processes were circumstantial and overinclusive. (*Id.*). Plaintiff was oriented, his

21  insight was limited, his judgment varied with his mood, and his attention and concentration

22  were good. (TR. 407). Dr. Witek's diagnoses was: "PTSD sec MST; Depressive d/o;

23  Alc/Marij abuse/dependence." (*Id.*). Dr. Witek noted that Plaintiff "did not tolerate increase

24  in Mirtaz sec sedation. Still symptomatic....Given chronicity of..." Plaintiff's symptoms Dr.

25  Witek prescribed a trial of Citalopram to be taken with the Mirtazapine, which Dr. Witek

26  reduced to 15 mg. (TR. 407-08).

27

28

2.      Examining State Agency Physicians

On December 4, 2006, Plaintiff underwent a consultative psychiatric examination by Hunter Yost, M.D. (TR. 232-34). Plaintiff complained of panic and anxiety attacks. (TR. 232). Plaintiff described panic attacks where "he feels a sense of impending doom, increase[d] heart rate, pressure in his chest, and he does not like to be out in public. These attacks started approximately three years ago." (*Id.*). He also described "depressive symptoms what he calls seasonal depression where he feels less active, less energetic, more apathetic and more panic attacks in the winter months as opposed to the lighter months of the year." (*Id.*). Plaintiff reported that he had been taking Mirtazapine, which made him feel sedated, and Trazodone. (*Id.*). He did not feel that the medication was helping with his panic attacks or depression. (*Id.*).

Plaintiff told Dr. Yost that he had first sought psychiatric help approximately five years previously for panic attacks. (*Id.*) Plaintiff stated that he had been hospitalized three years previously when "he felt like harming another person who was accused of sexual assault of his younger sister. He was in the hospital for two days." (*Id.*).

Plaintiff denied any suicidal thoughts at present, but reported having suicidal thoughts when he was sexually assaulted at age 18. (*Id.*).

Plaintiff told Dr. Yost he last worked three years ago when he delivered pizzas. (TR. 233). "He was offered the position of store manager but declined because he did not want to manage younger people. He said that he was held up at gunpoint three times in the store and two times on delivery." (*Id.*). Prior to working at the pizza restaurant, Plaintiff worked at a stool and dinette factory, building and delivering furniture for one and one-half years. (*Id.*).

Plaintiff stated that he had not used alcohol or drugs for the past three years. (*Id.*). Prior to that, he had used marijuana and alcohol on a daily basis. (*Id.*).

Plaintiff reported that on an average day he got up about 11:00 a.m., would watch a movie, eat, and go back to sleep, "waking up again..." in a few hours to follow the same pattern until 1:00 a.m. when he "shuts off all the lights and tries to go to sleep for good."

1    (*Id.*).  During warmer months, "he might do some yard work outside, play with the dog, and

2    occasionally help with some chores for his diabetic mother."  (*Id.*).  He takes the city bus

3    "approximately three times a week to go to various appointments to which he is obligated,

4    otherwise he prefers to just stay at home."  (*Id.*).

5         Dr. Yost noted that Plaintiff's overall grooming was poor and "[h]e had a 'homeless'

6    appearance....He was pleasant and congenial.  Mood was not depressed or elated.  He was

7    mildly but not excessively anxious.  He spoke coherently and fluently.  He maintained good

8    eye contact."  (*Id*).  Plaintiff had no suicidal or homicidal thinking.  (*Id.*).

9         On the Mini-Mental Status Examination, Plaintiff scored 30 out of 30 points.  (*Id.*).

10   Plaintiff showed no signs of a thought disorder, hallucinations, or delusions.  (TR. 234).  His

11   judgment was good and insight fair.  (*Id.*).  Dr. Yost noted that Plaintiff "performed well on

12   cognitive exam."  (*Id.*).

13        Dr. Yost's diagnosis was: "AXIS I:  Panic disorder without agoraphobia. Depression,

14   NOS. Polysubstance abuse in remission three years....AXIS IV: No structured daily activities,

15   social support with family."  (*Id.*).  Dr. Yost assessed a GAF score of 45 to 50. (*Id.*).  Dr.

16   Yost opined that Plaintiff would be able to manage his benefits on his own behalf.  (*Id.*).

17        Dr. Yost completed a Medical Source Statement of Ability to do Work Related

18   Activities (Mental) wherein he noted that with regard to understanding and carrying out, and

19   remembering, Plaintiff had "[n]o evidence of limitation in..." his ability to: remember

20   locations and work-like procedures; understand and remember very short and simple

21   instructions; and understand and remember detailed instructions. (TR. 235-36).  With regard

22   to sustained concentration and persistence, Dr. Yost found that Plaintiff had no limitation

23   concerning the ability to: carry out very short and simple instructions; carry out detailed

24   instructions; maintain attention and concentration for extended periods; sustain an ordinary

25   routine without special supervision; and make simple work-related decisions. (TR. 236-37).

26

27

28

1   Under this same category, Dr. Yost found that Plaintiff had mild[6] limitations with regard to

2   the ability to: perform activities within a schedule, maintain regular attendance, and be

3   punctual within customary tolerances; and work in coordination or proximity to others

4   without being distracted by them. (*Id.*). Within this same category, Dr. Yost found that

5   Plaintiff was moderately[7] limited in his ability to complete a normal workday and workweek

6   without interruptions from psychologically based symptoms and to perform at a consistent

7   pace without an unreasonable number and length of rest periods. (TR. 237). Dr. Yost based

8   his opinion of the limitations noted on Plaintiff's "reluctance to leave his house during the

9   winter moths due to panic attacks, hypersomnia and low motivation." (*Id.*). With regard to

10  social interaction, Dr. Yost opined that Plaintiff was mildly limited in his ability to: interact

11  appropriately with the general public; ask simple questions or request assistance; accept

12  instructions and respond appropriately to criticism from supervisors; get along with co-

13  workers or peers without distracting them or exhibiting behavioral extremes; and maintain

14  socially appropriate behavior and adhere to basic standards of neatness and cleanliness. (TR.

15  237-38). Dr. Yost provided no findings on which to base these limitations. (*See* TR. 238).

16  With regard to the category of adaptation, Dr. Yost opined that Plaintiff was not limited in

17  his ability to travel in unfamiliar places or use public transportation but he was mildly limited

18  concerning his ability to: respond appropriately to changes in the work setting; be aware of

19  normal hazards and take appropriate precautions. (TR. 238). Additionally, with regard to

20  adaptation, Plaintiff was moderately limited in his ability to set realistic goals or make plans

21  independently of other. (*Id.*). Dr. Yost indicated that Plaintiff was so limited "[d]ue to no

22  apparent future goals stated at this time." (*Id.*).

23

24

25

26      [6]In this context, "mild" limitations means "[n]ot significantly limited (good/mild)
    limitations)." (TR. 236).

27      [7]In this context, "moderate" limitations means "fair/limited but not precluded...." (TR.

28  236).

### 3.    Non-examining State Agency Physicians

In December 2006, state agency psychiatrist A. Taheri, M.D., reviewed Plaintiff's file. Based upon his review, Dr. Taheri noted that Plaintiff's activities of daily living were "not particularly limited." (TR. 227).  He also noted that Plaintiff was receiving benefits from the VA for PTSD.  (*Id.*).

Dr. Taheri completed a Psychiatric Review Technique form wherein he indicated that Plaintiff had the following medically determinable impairments: depression disorder not otherwise specified, panic disorder without agoraphobia, and polysubstance abuse in remission for three years.  (TR. 213, 216, 218, 221).  He found that Plaintiff had: mild restriction of activities of daily living; moderate difficulties in maintaining social functioning; mild difficulties in maintaining concentration, persistence, or pace; and no episodes of decompensation. (TR. 223).

Dr. Taheri completed a Mental Residual Functional Capacity Assessment wherein he indicated that Plaintiff had no significant limitations with regard to the areas of understanding and memory and adaptation.  (TR. 228-29).  In assessing eight abilities under the category "sustained concentration and persistence", Dr. Taheri opined that Plaintiff was moderately limited in his "ability to perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances" and his "ability to complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods"; otherwise Plaintiff was not significantly limited in any of the six other abilities. (*Id.*).  With regard to social interaction, Dr. Taheri indicated that Plaintiff was somewhere between not significantly limited and moderately limited in his ability to: accept instructions and respond appropriately to criticism from others; get along with co-workers and peers without distracting them or exhibiting behavioral extremes; and maintain socially appropriate behavior and to adhere to basic standards of neatness and cleanliness. (TR. 229).  Under that same category, Dr. Taheri found that Plaintiff had no limitation with regard to the ability to interact appropriately with the general public and the ability to ask simple questions or

1    request assistance.   (*Id.*).   Dr. Taheri's findings of limitations with regard to social

2    interactions were based on Plaintiff's panic disorder.  (TR. 230).  Dr. Taheri ultimately

3    concluded that although Plaintiff's impairment was severe, Plaintiff did not meet or equal a

4    listing and he retained the ability to perform simple tasks.  (TR. 227,  230). Dr. Taheri also

5    stated that "review of the VA...record does not change..." his determination.  (TR. 227).

6         In April 2007, state agency psychologist Alan Goldberg, Psy.D., completed a

7    Psychiatric Review Technique wherein he indicated that Plaintiff suffered from depression

8    not otherwise specified, anxiety not otherwise specified, and substance addiction disorder

9    (TR. 102, 105, 107, 110). Dr. Goldberg found that Plaintiff had: mild restriction of activities

10   of daily living; moderate difficulties in maintaining social functioning; mild difficulties in

11   maintaining concentration, persistence, or pace; and no episodes of decompensation.  (TR.

12   112).

13        Dr. Goldberg also completed a Residual Functional Capacity Assessment wherein he

14   found that Plaintiff was not significantly limited with regard to understanding and memory.

15   (TR. 116).  With regard to the area of sustained concentration and persistence, Dr. Goldberg

16   opined that Plaintiff was moderately limited in his ability to: work in coordination with or

17   proximity to others without being distracted by them; and complete a normal workday and

18   workweek without interruptions from psychologically based symptoms and to perform at a

19   consistent pace without an unreasonable number and length of rest periods; otherwise

20   Plaintiff was not significantly limited in any of the six other abilities. (TR. 116-17).  With

21   regard to social interaction, Dr. Goldberg found that Plaintiff was not significantly limited

22   in his ability to maintain socially appropriate behavior and adhere to basic standards of

23   neatness and cleanliness or in his ability to ask simple questions or request assistance, but

24   Plaintiff was moderately limited in his ability to: interact appropriately with the general

25   public; accept instructions and respond appropriately to criticism from supervisors; and get

26   along with co-workers or peers without distracting them or exhibiting behavioral extremes.

27   (TR. 117).  Finally, with regard to the four abilities listed under the category for  adaptation,

28   Plaintiff was moderately limited his ability to set realistic goals or make plans independently

1  of others; otherwise he was not significantly limited in the remaining three abilities listed.

2  (*Id.*).

3      Dr. Goldberg noted that Plaintiff had a VA disability rating.[8]  (TR. 118).  He

4  questioned examining Dr. Yost's GAF score of 45-50 because it "seem[ed] grossly

5  inaccurate, as...[the medical source statement] had only 1 mod[erate] limitation!"  (*Id.*)

6  (exclamation point in original). Dr. Goldberg noted that over the past year, Plaintiff's GAF

7  scores had otherwise ranged from 55-63, "altho[ugh] MD said current rating of 50 is because

8  he 'can't work.'"  (*Id.*).  He pointed out that Plaintiff has successfully worked in multiple

9  jobs requiring minimal public contact.  (*Id.*).  "His dress and grooming are good, cognition

10 is intact, adaptation is suitable for simple work.  Persistence and pace are limited only by

11 interpersonal contacts creating anxiety. [Plaintiff]...is fully independent [with activities of

12 daily living], he shops, uses public transportation. [Plaintiff]...appears capable of simple

13 unskilled work [with] minimal social demands."  (*Id.*).

14      C.    VA Disability Rating at the Time of the ALJ's Decision

15      The record reflects that when the ALJ entered his decision on November 20, 2007, the

16 VA had assigned Plaintiff a 50% disability rating for "[p]ost traumatic stress disorder, also

17 claimed as depression." (TR. 11, 4).  Neither the VA decision awarding a 50% rating nor its

18 effective date are in the record.  Dr. Clymer's December 2006 report indicates Plaintiff "is

19 claiming service-connection for [PTSD]...and depression...." (TR. 138).  It may be that Dr.

20 Clymer's report is the precursor to the 50% disability rating, but the record is not clear on

21 this issue.

22      D.    Lay Testimony

23      In August 2007, approximately two weeks after the hearing, but before th ALJ' s

24 denial of Plaintiff's claim, Plaintiff's counsel submitted a Function  Report completed by

25 Plaintiff's brother Chris Chariton.  (Defendant's Opp., p. 11; *see also* Plaintiff's Brief, Exh.

26

27      [8]At that time, Plaintiff had a VA disability rating of 50%.  (Defendant's Opp., p.9 n.7

28 (*citing* TR. 422)).

- 22 -

1).[9]  Mr. Chariton stated that Plaintiff was very distracted and anxious and had poor ability
to focus.  (Plaintiff's Brief, Exh. 1, p.1)   Plaintiff was very hesitant to  leave the house and
he either got rides with Mr. Chariton or took public transportation when he needed to go
anywhere.  (*Id.*).   Mr. Chariton indicated that Plaintiff did not socialize and was unable to
work due to anxiety, depression, and health issues.  (*Id.* at p.2).  Plaintiff was very forgetful
and had to be reminded to take medication, eat, and care for his personal needs.  (*Id.* at p.3).
Plaintiff prepared his own meals–frozen dinners–when he felt up to it.  (*Id.*)   Although
Plaintiff  attempted yard work and housework he rarely completed such chores becomes he
becomes distracted and/or experiences anxiety.  (*Id.*).  Plaintiff rarely went out and did not
like to go out alone.  (*Id.* at p.4).  Plaintiff's mother did most of the grocery shopping and
Plaintiff rarely went to the store because he would lose track of time and become confused
and unable to make up his mind.  (*Id.*).  Mr. Chariton opined that Plaintiff was able to handle
his own money, savings account and checkbook.  (*Id.*).

According to Mr. Chariton, Plaintiff was "very secluded-depressed-doesn't enjoy
much of anything." (*Id.* at p.5.) Plaintiff spent time with family, attended VA appointments,
and, on rare, occasions, went to church.  (*Id.*).  Also according to Mr. Chariton, Plaintiff had
difficulty with talking, memory, completing tasks, concentration, understanding, following
instructions and getting along with others.  (*Id.* at p.6).

E.      The ALJ's Findings

        1.      Claim Evaluation

SSA regulations require the ALJ to evaluate disability claims pursuant to a five-step
sequential process. 20 C.F.R. §§404.1520, 416.920; *Baxter v. Sullivan,* 923 F.2d 1391, 1395
(9th Cir. 1991).  The first step requires a determination of whether the claimant is engaged
in substantial gainful activity.  20 C.F.R. §§ 404.1520(b), 416.920(b).  If so, then the
claimant is not disabled under the Act and benefits are denied.  *Id.*  If the claimant is not

---

[9]"For reasons that are unclear, the report was omitted from the filed administrative
record, but the ALJ did consider and discuss the report in his decision (T[R]. 24), and the
Court may consider it as record evidence."  (Defendant's Opp., p.11 n.8).

1   engaged in substantial gainful activity, the ALJ then proceeds to step two which requires a
2   determination of whether the claimant has a medically severe impairment or combination of
3   impairments. 20 C.F.R. §§ 404.1520(c), 416.920(c).  In making a determination at step two,
4   the ALJ uses medical evidence to consider whether the claimant's impairment more than
5   minimally limited or restricted his or her physical or mental ability to do basic work
6   activities.  *Id.* If the ALJ concludes that the impairment is not severe, the claim is denied.
7   *Id.* If the ALJ makes a finding of severity, the ALJ proceeds to step three which requires a
8   determination of whether the impairment meets or equals one of several listed impairments
9   that the Commissioner acknowledges are so severe as to preclude substantial gainful activity.
10  20 C.F.R. §§ 404.1520(d), 416.920(d); 20 C.F.R. Pt. 404, Subpt. P, App.1.  If the claimant's
11  impairment meets or equals one of the listed impairments, then the claimant is presumed to
12  be disabled and no further inquiry is necessary.   If a decision cannot be made based on the
13  claimant's then current work activity or on medical facts alone because the claimant's
14  impairment does not meet or equal a listed impairment, then evaluation proceeds to the fourth
15  step.   The fourth step requires the ALJ to consider whether the claimant has sufficient
16  residual functional capacity (hereinafter "RFC")[10] to perform past work.   20 C.F.R. §§
17  404.1520(e), 416.920(e).  If the ALJ concludes that the claimant has RFC to perform past
18  work, then the claim is denied.  *Id.*  However, if the claimant cannot perform any past work
19  due to a severe impairment, then the ALJ must move to the fifth step, which requires
20  consideration of the claimant's RFC to perform other substantial gainful work in the national
21  economy in view of claimant's age, education, and work experience.   20 C.F.R. §§
22  404.1520(f). 416.920(f).  At step five, in determining whether the claimant retained the
23  ability to perform other work, the ALJ may refer to Medical Vocational Guidelines
24  (hereinafter "grids") promulgated by the SSA.  *Desrosiers v. Secretary,* 846 F.2d 573, 576-
25  577 (9th Cir. 1988).  The grids are a valid basis for denying claims where they accurately
26
27           [10]RFC is defined as that which an individual can still do despite his or her limitations.
28  20 C.F.R. §§ 404.1545, 416.945.

describe the claimant's abilities and limitations. *Heckler v. Campbell,* 461 U.S. 458, 462, n.5 (1983). However, because the grids are based on exertional or strength factors, the grids do not apply where the claimant has significant nonexertional limitations. *Penny v. Sullivan,* 2 F.3d 953, 958-959 (9th Cir. 1993); *Reddick v. Chater,* 157 F.3d 715, 729 (9th Cir. 1998). When the grids do not apply, the ALJ must use a vocational expert in making a determination at step five. *Desrosiers,* 846 F.2d at 580.

### 2.    The ALJ's Decision

In his November 20, 2007 decision, the ALJ made the following findings:

1.    The claimant meets the insured status requirements of the Social Security Act through June 30, 2008.

2.    The claimant has not engaged in substantial gainful activity since September 15, 2003, the alleged onset date (20 CFR 404.1520(b), 404.1571 *et seq.*, 416.920(b) and 416.971 *et seq.*).

3.    The claimant has the following severe combination of impairments: depression and anxiety (20 CFR 404.1520(c) and 416.920(c)).

    ***

4.    The claimant does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925 and 416.926).

    ***

5.    After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform a full range of work at all exertional levels but with the following nonexertional limitations: he is moderately limited in his abilities to work with co-workers, supervisors and the general public.

    ***

6.    The claimant is capable of performing past relevant work as a pizza delivery driver. This work does not require the performance of work-related activities precluded by the claimant's residual functional capacity (20 CFR 404.1565 and 416.965).

    ***

1

2

      7.     The claimant has not been under a disability, as defined in the Social Security Act, from September 15, 2003 through the date of this decision (20 CFR 404.1520(f) and 416.920(f)).

3

DECISION

4

5

Based on the application for a period of disability and disability insurance benefits protectively filed on July 21, 2006, the claimant is not disabled under section 216(I) and 223(d) of the Social Security Act.

6

7

Based on the application for supplemental security income protectively filed on July 21, 2006, the claimant is not disabled under section 1614(a)(3)(A) of the Social Security Act.

8

(TR. 19-25)

9

      The ALJ gave significant weight to opinions of the non-examining State agency

10

medical consultants. (TR.24).  He did not "grant significant weight to..." the GAF scores of

11

45-50 because they are contradicted by the evidence and "are inconsistent with...[Plaintiff's]

12

assessment of his ability to return to his past work and the lack of marked limitations in the

13

medical source statements."  (*Id.*).

14

      The ALJ also discounted the statement from Plaintiff's brother, Mr. Chariton, due to

15

Mr. Chariton's relationship to Plaintiff and lack of medical training.  (*Id.*).

16

      The ALJ stated that he "has given appropriate weight to the VA determination of

17

disability."  (*Id.*).

18

      Upon consideration of the record, the ALJ found that Plaintiff's "medically

19

determinable impairments could reasonably be expected to produce the alleged symptoms,

20

but that...[Plaintiff's] statements concerning the intensity, persistence and limiting effects of

21

these symptoms are not entirely credible."  (*Id.*).

22

      F.    Additional Evidence Submitted to the Appeals Council

23

      In July 2008, eight months after the ALJ's decision, the VA issued a Rating Decision

24

increasing Plaintiff's disability rating, with regard to "post traumatic stress disorder, also

25

26

27

28

claimed as depression..." from 50% to 70% effective March 14, 2008.[11] (TR. 422).  The VA decision stated:

> An evaluation of 70 percent is assigned for occupational and social impairment, with deficiencies in most areas, such as work, school, family relations, judgment, thinking, or mood, due to such symptoms as: suicidal ideation; obsessional rituals which interfere with routine activities; speech intermittently illogical, obscure, or irrelevant; near-continuous panic or depression affecting the ability to function independently, appropriately and effectively; impaired impulse control (such as unprovoked irritability with periods of violence); spatial disorientation; neglect of personal appearance and hygiene; difficulty in adapting to stressful circumstances (including work or a worklike setting); inability to establish and maintain effective relationships.[12]

(TR. 423).  The VA decision cited a May 8, 2008 examination of Plaintiff wherein Plaintiff complained of interrupted sleep, experiencing panic attacks once or twice a week, and experiencing panic attacks when he had to leave his home.  (*Id.*).  At the time of examination, Plaintiff was oriented, had no delusions or hallucinations, exhibited no indication of cognitive impairment or thought disorder, and his long term and short term memories appeared to be intact.  (*Id.*).  Although he denied suicidal ideation, he did state that he thought "about being dead."  (*Id.*).  Plaintiff's

> rate and flow of speech was somewhat halting.  You[] appeared anxious and tense throughout the examination.  The examiner noted your overall behavior seemed to be within normal limits.  The examiner did, however, state that your symptoms of anxiety and fearfulness were severe and you are currently not capable of working at this time, even in a structured setting; noting your symptoms needed to be more consistently managed before you could go to work...The examiner diagnosed chronic post traumatic stress disorder and major depressive disorder.

---

[11]March 14, 2008 was the date on which the VA received Plaintiff's claim for increased rating.  (TR. 423).  The March 14, 2008 effective date was four months after the ALJ's decision.

[12]A higher evaluation of 100% is not warranted unless there is
[t]otal occupational and social impairment, due to such symptoms as: gross impairment in thought processes or communication; persistent delusions or hallucinations; grossly inappropriate behavior; persistent danger of hurting self or others; intermittent inability to perform activities of daily living (including maintenance of minimal personal hygiene); disorientation to time or place; memory loss for names of close relatives, own occupation, or own name.
38 C.F.R. §4.130.  (*See also* TR. 423).

(TR. 423-24).  The examiner also assigned a current GAF score of 47 and noted that Plaintiff's GAF score for the past year was 50.  (TR. 424).

G.      The Appeals Council's Decision

On June 26, 2009, the Appeals Council issued its decision denying Plaintiff's request for review.  (TR. 4-7).  The Appeals Council indicated that it would review a case if: (1) the ALJ appears to have abused his or her discretion; (2) there is an error of law; (3) the decision is not supported by substantial evidence; (4) there is a broad policy or procedural issue that may affect public interest; or (5) "[w]e receive new and material evidence and the decision is contrary to the weight of all of the evidence now in the record."  (TR. 4); *see also* 20 C.F.R. §404.970.  Upon consideration of Plaintiff's argument on appeal and the July 31, 2008 VA 70% Disability Rating Decision, the Appeals Council "found that this information does not provide a basis for changing the Administrative Law Judge's decision."  (TR. 4-5, 7).

III.    DISCUSSION

A.      Argument

Plaintiff argues that the ALJ improperly rejected the 70% VA disability rating and medical opinions concerning Plaintiff's GAF score.  Plaintiff also argues that the ALJ's credibility determination was erroneous and that the ALJ improperly rejected lay evidence from Mr. Chariton.

Defendant asserts that the ALJ's decision is supported by substantial evidence, the ALJ properly considered and discounted Plaintiff's GAF scores, and he properly considered the 50% VA disability rating.  Defendant also asserts that the 70% VA disability rating did not pertain to the relevant time period.  Defendant contends that the ALJ properly discounted Plaintiff's credibility.  Additionally, although Defendant concedes that one of the two grounds cited by the ALJ to reject Mr. Chariton's testimony was improper, Defendant maintains that the other ground was acceptable and, thus, any error was harmless.

1          B.      Standard of Review

2          An individual is entitled to disability insurance benefits if he or she meets certain

3   eligibility requirements and demonstrates the inability to engage in any substantial gainful

4   activity by reason of any medically determinable physical or mental impairment which can

5   be expected to result in death or which has lasted or can be expected to last for a continuous

6   period of not less than twelve months. 42 U.S.C. §§ 423, 1382. "'A claimant will be found

7   disabled only if the impairment is so severe that, considering age, education, and work

8   experience, that person cannot engage in any other kind of substantial gainful work which

9   exists in the national economy.'" *Penny,* 2 F.3d at 956 (*quoting Marcia v. Sullivan,* 900 F.2d

10  172, 174 (9th Cir. 1990)).

11         To establish a *prima facie* case of disability, the claimant must demonstrate an

12  inability to perform his or her former work. *Gallant v. Heckler*, 753 F.2d 1450, 1452 (9th Cir.

13  1984). Once the claimant meets that burden, the Commissioner must come forward with

14  substantial evidence establishing that the claimant is not disabled. *Fife v. Heckler*, 767 F.2d

15  1427, 1429 (9th Cir. 1985).

16         The findings of the Commissioner are conclusive and courts may overturn the

17  decision to deny benefits "only if it is not supported by substantial evidence or it is based on

18  legal error." *Matney v. Sullivan,* 981 F.2d 1016, 1019 (9th Cir. 1992)(citations omitted).

19  Therefore, the Commissioner's determination that a claimant is not disabled must be upheld

20  if the Commissioner applied the proper legal standards and if the record as a whole contains

21  substantial evidence to support the decision. *Clem v. Sullivan*, 894 F.2d 328, 330 (9th Cir.

22  1990) (citing *Desrosiers*, 846 F.2d at 575-76; *Delgado v. Heckler*, 722 F.2d 570, 572 (9th

23  Cir. 1983)). Substantial evidence is defined as such relevant evidence which a reasonable

24  mind might accept as adequate to support a conclusion. *Jamerson v. Chater,* 112 F.3d 1064,

25  1067-68 (9th Cir. 1997); *Winans v. Bowen,* 853 F.2d 643, 644 (9th Cir. 1988). However,

26  substantial evidence is less than a preponderance. *Matney,* 981 F.2d at 1019.

27         The Commissioner, not the court, is charged with the duty to weigh the evidence,

28  resolve material conflicts in the evidence and determine the case accordingly. *Id.* However,

1    when applying the substantial evidence standard, the court should not mechanically accept

2    the Commissioner's findings but should review the record critically and thoroughly. *Day v.*

3    *Weinberger*, 522 F.2d 1154 (9th Cir. 1975).  Reviewing courts must consider the evidence

4    that supports as well as detracts from the examiner's conclusion. *Id*. at 1156.

5         In evaluating evidence to determine whether a claimant is disabled, the opinions of

6    treating physicians are entitled to great weight. *Magallanes v. Bowen,* 881 F.2d 747, 751 (9th

7    Cir. 1989). However, even a treating physician's opinion is not necessarily conclusive on

8    either the issue of a physical condition or the ultimate issue of disability. *Id.* When resolving

9    a conflict between the opinion of a treating physician and that of an examining or non-

10   examining physician, the opinion of the treating physician is entitled to greater weight and

11   may be rejected only on the basis of findings setting forth specific legitimate reasons based

12   on substantial evidence of record.   *Magallanes,* 881 F.2d at 751.   Moreover, the

13   Commissioner may reject the treating physician's uncontradicted opinion as long as the

14   Commissioner sets forth clear and convincing reasons for doing so. *Magallanes*, 881 F.2d

15   at 751.

16        Further, when medical reports are inconclusive, questions of credibility and resolution

17   of conflicts in the testimony are functions solely of the Commissioner. *Magallanes,* 881 F.2d

18   at 751 (citations omitted).  However, the Commissioner's finding that a claimant is less than

19   credible must have some support in the record. *See Light v. Social Security Administration,*

20   119 F.3d 789 (9th Cir. 1997); *Connett v. Barnhart,* 340 F.3d 871 (9th Cir. 2003).

21        C.    Analysis

22             1.    VA Disability Ratings

23                  a.    The 2008 VA Disability Rating

24        Plaintiff argues that the 2008 VA Disability Rating vitiates the ALJ's decision.

25        The ALJ issued his decision in November 2007. The 2008 VA decision increasing

26   Plaintiff's rating to 70% was issued in July 2008 and made retroactive to March 2008. (TR.

27   422-424). Plaintiff submitted the 2008 disability rating to the Appeals Council. (*See* TR. 7).

28   According to Plaintiff, "[t]he Appeals Council erred in disregarding the new disability rating

as not important to the ALJ's decision." (Reply, p.2). Defendant argues that the 2008 disability rating did not provide a basis for changing the ALJ's opinion because it did not pertain to the relevant time period. (Defendant's Opp., p. 20).

"Because social security disability and VA disability programs 'serve the same governmental purpose–providing benefits to those unable to work because of a serious disability,' the ALJ must give 'great weight to a VA determination of disability.'" *Turner v. Commissioner of Social Security,* 613 F.3d 1217, 1225 (9th Cir. 2010) (*quoting McCartey v. Massanari,* 298 F.3d 1072, 1076 (9th Cir. 2002)). However, an ALJ "'may give less weight to a VA disability rating if he gives persuasive, specific, valid reasons for doing so that are supported by the record.'" *Id.* (*quoting McCartey,* 298 F.3d at 1076).

Here, Plaintiff submitted the 2008 VA disability rating after the ALJ issued his November 20, 2007 hearing decision. Plaintiff argues that the timing of the 2008 disability rating is irrelevant because "[i]n both *McCartey* and *Valentine [v. Commissioner of Social Security Admin.,* 574 F.3d. 685 (9th Cir. 2009)], the VA disability rating was not available until after the hearing and either while the case was pending or after the decision." (Plaintiff's Reply, p. 2). Unlike the instant case, the VA disability ratings in *McCartey* and *Valentine* were available to the ALJ before the ALJ issued a decision. *See McCartey,* 298 F.3d at 1073-75 (plaintiff's VA disability rating was issued in 1997 and the ALJ's 1998 "opinion contain[ed] no reference to the VA disability rating.")[13]; *Valentine,* 574 F.3d at 694 ("while his case was pending before the ALJ, the VA rated Valentine 100 percent disabled" and the ALJ discussed that rating in his decision).

Applicable regulations provide that the Appeals Council will review a case if: the ALJ

---

[13]The plaintiff in *McCartey* did submit new VA medical records to the Appeals Council that had not previously been submitted to the ALJ. *See McCartey,* 298 F.3d at 1075. The Appeals Council found the new records were not material because they were dated after the ALJ's decision. *Id.* The Ninth Circuit held that the Appeals Council erred in this determination because the records contained history of the plaintiff's depression that predated the ALJ's decision. *Id.* at 1077 n.7. The instant Plaintiff does makes no similar argument here.

appears to have abused his or her discretion; there is an error of law; the decision is not supported by substantial evidence; there is a broad policy or procedural issue that may affect public interest; or the Appeals Council receives new and material evidence and the ALJ's decision is contrary to the weight of all of the evidence currently of record. 20 C.F.R. §404.970 (a)-(b). Specifically with regard to new evidence, the regulation provides:

> If new and material evidence is submitted, the Appeals Council shall consider the additional evidence *only where it relates to the period on or before the date of the administrative law judge hearing decision.* The Appeals Council shall evaluate the entire record including the new and material evidence submitted if it relates to the period on or before the date of the administrative law judge hearing decision. It will then review the case if it finds that the administrative law judge's action, findings, or conclusion is contrary to the weight of the evidence currently of record.

20 C.F.R. §404.970(b) (emphasis added). The Appeals Council was clear that it considered the 2008 VA disability rating, but found that there was no reason for changing the ALJ's decision. (*See* TR.4-5, 7). Where the Appeals Council considered evidence not previously presented to the ALJ, the Court may consider such evidence on review. *See Lingenfelter v. Astrue,* 504 F.3d 1028, 1030 n.2 (9th Cir. 2007) (considering on appeal both the ALJ's decision and the additional material submitted to the Appeals Council); *Harman v. Apfel,* 211 F.3d 1172, 1180 (9th Cir. 2000) (recognizing that "[w]e properly may consider the additional materials because the Appeals Council addressed them in the context of denying Appellant's request for review" and remanding for further proceedings); *Ramirez v. Shalala,* 8 F.3d 1449, 1452 (9th Cir. 1449, 1452 ("we consider on appeal both the ALJ's decision and the additional material submitted to the Appeals Council."). However, the regulation is clear that the Appeals Council shall consider such newly submitted evidence only to the extent that the evidence "relates to the period on or before the date of the administrative law judge hearing decision." 20 C.F.R. §404.970(b).

As Defendant points out, the ALJ's decision issued on November 20, 2007–approximately four months *prior* to the effective date of the 2008 VA disability rating. The 2008 VA disability rating is based upon, "review of [the] claims file", Plaintiff's March 2008 request for increased disability rating, VA treatment records from March 2, 2006

through March 10, 2008, a VA letter dated April 17, 2008, and a VA PTSD examination dated May 8, 2008.[14] (TR. 423). Unlike *McCartey,* where the Appeals Council held that new evidence was not material because it was dated after the ALJ's decision, *see McCartey,* 298 F.3d at 1075, there is no indication in the instant record of the precise reason why the Appeals Council concluded that the 2008 VA disability rating did not provide a basis for changing the ALJ's decision.

The majority of Plaintiff's symptoms described in the 2008 VA disability rating decision are consistent with his complaints that appear in the medical records before the ALJ. Likewise, the facts that Plaintiff was oriented and that there was no indication of cognitive impairment are also consistent with the medical records before the ALJ. Although the 2008 VA rating decision reflects  a 2008 GAF score of 47, that decision also reflects that Plaintiff's GAF score for the past year was 50, which is also consistent with the record before the ALJ. (TR. 424). Plaintiff has not argued that evidence pertinent to the 2008 VA disability rating relevant to the time predating the ALJ's decision was not presented to the ALJ or how any such evidence differed from the evidence that was before the ALJ when he rendered his decision. On the instant record, and in light of 20 C.F.R. §404.970(b), Plaintiff has not established that the ALJ's decision should be overturned or otherwise remanded based upon the November 2008 VA disability rating.

### b.    The 50% VA Disability Rating

There is no dispute that sometime prior to the hearing before the ALJ, Plaintiff received a 50% VA disability rating for PTSD "also claimed as depression" (TR. 11). The actual 50% rating decision is not in the record. Nor does the record reflect the date Plaintiff received this rating.

A 50% VA disability rating denotes:

Occupational and social impairment with reduced reliability and productivity

---

[14]The administrative record herein does not contain Plaintiff's request for increased disability rating, a VA letter dated April 7, 2007, medical records post-dating the ALJ's decision, or the May 8, 2008 PTSD examination.

due to such symptoms as: flattened affect; circumstantial, circumlocutory, or stereotyped speech; panic attacks more than once a week; difficulty in understanding complex commands; impairment of short- and long-term memory (e.g., retention of only highly learned material, forgetting to complete tasks); impaired judgment; impaired abstract thinking; disturbances of motivation and mood; difficulty in establishing  and maintaining effective work and social relationships.

38 C.F.R. § 4.130.

The ALJ stated that he "has given appropriate weight to the VA determination of disability." (TR. 24).  Defendant asserts that this statement means that the ALJ did not reject the VA disability rating and that a 50% rating does not necessarily mean that a claimant is disabled under the Social Security Act. (Defendant's Opp., p. 20).

It would have been helpful had the ALJ specifically stated that he was not discounting the rating.  If the ALJ did not discount the VA disability rating, then he was required to give that rating "great weight." *Turner,* 613 F.3d at 1225.  It is arguable that the RFC designated by the ALJ accounted for the symptoms for which Plaintiff was granted a 50% disability rating.  For other reasons discussed below, the Court has determined that remand for further proceedings is necessary.  On remand, the ALJ should clarify his ruling on this issue.

2.     The ALJ's adoption of opinions of non-examining state agency physicians

Plaintiff argues that the ALJ's decision rests entirely on non-examining Dr. Goldberg's opinion and that the ALJ failed to provide specific and cogent reasons for rejecting the medical opinions of state agency examining Dr. Yost.[15]  (Plaintiff's Brief, pp.

_____

[15]Plaintiff also argues that the ALJ failed to provide specific reasons to reject non-examining Dr. Taheri's opinion. (Plaintiff's Brief, p.12).  Elsewhere in Plaintiff's brief, Plaintiff states that Dr. Taheri assessed a GAF score of 45-50. (*Id.* at p.7 (*citing* TR. 227)).  It is unclear from Dr. Taheri's report whether he assessed a GAF score of 45-50 or whether he was repeating Dr. Yost's findings given that much of his case analysis reflected what transpired at Dr. Yost's examination.  (*See* TR. 227).  It is clear that Dr. Taheri did not expressly reject Dr. Yost's GAF score.  Regardless whether Dr. Taheri adopted Dr. Yost's GAF assessment, Dr. Taheri ultimately concluded that Plaintiff's impairment was severe but it did not meet or equal a listing and that Plaintiff retained the ability to perform simple tasks despite moderate limitations in social functioning. (TR. 223, 227, 230).  This conclusion is

12-13).

"The regulations provide progressively more rigorous tests for weighing opinions as the ties between the source of the opinion and the individual become weaker." SSR 96-6p. The regulations are clear that "[u]nless the treating sources's opinion is given controlling weight, the administrative law judge must explain in the decision the weight given to the opinions of a State agency medical or psychological consultant or other program physician or psychologist, as the administrative law judge must do for any opinions from treating sources, nontreating sources, and other nonexamining sources who do not work for us." 20 C.F.R. § 404.1527(f)(2)(ii); *see also Andrews v. Shalala,* 53 F.3d 1035, 1041 (9th Cir. 1995) ("Both the regulations...and our precedent, *see Pitzer* [*v. Sullivan,*] 908 F.2d [502]...506 n.4 [(9th Cir. 1990)], state that the conclusion of a nonexamining expert is generally entitled to less weight than the conclusion of an examining physician.") "However, giving the examining physician's opinion *more* weight than the nonexamining expert's opinion does not mean that the opinions of nonexamining sources...are entitled to *no* weight." *Andrews,* 53 F.3d at 1041 (emphasis in original). *See also* SSR 96-6P (The ALJ "and the Appeals Council are not bound by findings made by State agency or other program physicians and psychologists, but they may not ignore these opinions and must explain the weight given to the opinions in their decisions.") Herein, the ALJ gave "significant weight to the opinions of the..." non-examining state agency consultants, Dr. Goldberg and Dr. Taheri. (*See* TR. 24). In doing so, the ALJ discounted examining Dr. Yost's GAF score of 45-50. The ALJ also rejected VA Dr. Clymer's GAF score of 50.

It is well-settled that "the opinion of an examining doctor, even if contradicted by another doctor, can only be rejected for specific and legitimate reasons that are supported by substantial evidence in the record." *Lester v. Chater,* 81 F.3d 821, 830-31 (9th Cir. 1995) (*citing Andrews,* 53 F.3d at 1043). However, the opinion of a non-examining physician, such

consistent with Dr. Goldberg's assessment that Plaintiff "appears capable of simple unskilled work [with] minimal social demands." (TR. 118). The ALJ gave significant weight to the opinions of the state agency medical consultants. (TR. 24).

as Dr. Goldberg, cannot "by itself constitute substantial evidence that justifies the rejection of the opinion of either an examining physician or a treating physician." *Id.* at 831.  To rely on the non-examining physician's opinion, the ALJ must also cite other evidence that conflicts with the examining physician's opinion such as, for example, other medical opinions, statements from the plaintiff, or laboratory results.  *Id.* at 830 (*citing Magallanes,* 881 F.2d at 751-55; *Andrews,* 53 F.3d at 1043); *Morgan v. Commissioner of Social Security,* 169 F.3d 595, 602 (9th Cir. 1999) ("we have consistently upheld the Commissioner's rejection of the opinion of a treating or examining physician based *in part* on the testimony of a nontreating, nonexamining medical advisor.")(emphasis in original).   "In short, '[a]n ALJ may reject the testimony of an examining, but non-treating physician, in favor of a nonexamining, nontreating physician when he gives specific, legitimate reasons for doing so, and those reasons are supported by substantial record evidence.'" *Lester,* 81 F.3d at 831 (*quoting Roberts v. Shalala,* 66 F.3d 179, 184 (9th Cir. 1995)).  The ALJ satisfies this burden "by setting out a detailed and thorough summary of the facts and conflicting clinical evidence, stating his interpretation thereof and making findings." *Magallanes,* 881 F.2d at 751 (citation omitted) (discussing same standard with regard to rejecting the opinion of a treating physician which conflicts with that of an examining physician).

The ALJ stated that "[r]ecent medical reports indicate that over the past year [Plaintiff's GAF]...scores have ranged from 55-63...." (TR. 21). The ALJ also recognized that Dr. Clymer assessed a GAF score of 50 because Plaintiff "'can't work'", and that examining Dr. Yost assessed a GAF score of 45-50.  (*Id.*).  The ALJ discounted examining Dr. Yost's GAF score of 45-50 because "this score is inconsistent with the medical source statement, which has only two moderate limitations." (*Id.*).  Later in his decision, the ALJ granted significant weight to Dr. Goldberg's opinion and  rejected GAF scores ranging from 45-50 because the scores "are contradicted by evidence in the record and are inconsistent with the claimant's assessment of his ability to return to his past work and the lack of marked limitations in the medical source statements." (TR. 24).

GAF scores range from 1-100.  *See DSM-IV*, p.32. In arriving at a GAF Score, the

clinician considers psychological, social, and occupational functioning on a hypothetical continuum of mental health illness. *Id.*  A GAF score of 41 to 50 denotes:

> Serious symptoms (e.g. suicidal ideation, severe obsessional rituals, frequent shoplifting), OR any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job).

*Id.* (emphasis omitted).   GAF scores are intended for use in planning treatment and measuring impact.  *Vance v. Astrue,* 2008 WL 2955140, at *5 (C.D. Cal. July 30, 2008) (*citing DSM-IV,* at p.32).  GAF scores have been described as "snapshot[s] in time..." *Mann v. Astrue,* 2009 WL 2246350, at *2 (C.D. Cal. July 24, 2009).  The GAF scale "'does not have a direct correlation to the severity requirements in [the Social Security Administration's] mental disorder listings.'"  *Id.* at *1 (*quoting* 65 Fed.Reg. 50,746, 50-764-65 (Aug. 21, 2000)).  While a low GAF score standing alone does not determine disability, it is evidence to be considered with the rest of the record.  *Id.* (*citing Olds v. Astrue,* 2008 WL 339757, at *4 (D.Kan. Feb. 5, 2008)).

Plaintiff persuasively argues that the ALJ, in rejecting GAF scores of 45-50, mistakenly construed Plaintiff's assessment of his ability to work.  (Plaintiff's Brief, pp. 12-13).  In this section of his opinion, the ALJ does not point to a specific statement made by Plaintiff to support his finding.  Later in the ALJ's decision, when finding that Plaintiff can return to his past work as a pizza delivery driver, the ALJ stated: "It is significant that the claimant informed his VA doctor in December 2006 that he 'like[d] that job because he essentially was delivering pizza and it was not necessary for him to interact with the public."  (TR. 24).  Plaintiff has applied for disability benefits based on his alleged inability to work.  He testified about his anxiety and panic attacks when he has to leave his home.  (TR. 435-36).  He also testified that he was not aware of any work that he was capable of doing.  (TR. 441).  Plaintiff did state to VA Dr. Clymer in 2006 that he enjoyed his previous work shuttling rental cars to various locations and delivering pizza because he was not required to interact with the public.  (*See* TR. 136-37).  Plaintiff also told Dr. Clymer at that same

appointment that in the last three years, i.e., since 2003,[16] it had become "harder and harder for him to be in a public place." (TR. 137). Plaintiff further stated to Dr. Clymer that although he must use public transportation, he is constantly on alert when riding the bus. (TR. 136). During his appointment with Dr. Clymer, Plaintiff insisted that the door to the office be left ajar. (*Id.*). On the instant record, the fact that Plaintiff enjoyed his prior work does not equate to a concession from Plaintiff that he remains able to perform such work. Plaintiff's statements in the record support, rather than contradict a GAF score that involves symptoms concerning social or occupational functioning.

In Dr. Goldberg's April 2007 report, to which the ALJ granted significant weight, Dr. Goldberg wrote that "over [the] past year...[Plaintiff's] GAF scores have ranged from 55-63." (TR. 118). Dr. Goldberg discounted Dr. Clymer's December 2006 assessment of 50 and Dr. Yost's assessment of 45-50. (*Id.*). Dr. Goldberg did not mention treating Dr. Witek's February 2007 GAF score of 50. (*See* TR. 407). Dr. Goldberg's, and consequently the ALJ's, focus on the "past year" also overlooked that between 2003 and May 2005, medical providers consistently assessed a GAF score of 50 on five occasions (TR. 329 (June 2003); TR. 313 (September 2004, March 2005); TR. 182 (May 18, 2005, May 20, 2005)).[17] During that time period, a score of 55[18] was assessed on two occasions (TR. 313 (May 2004, November 2004)), and a score of 60 was assessed once. (TR. 182 (August 2005); *see also* (TR. 179 (same)).

Defendant points out that Plaintiff had a GAF score of 50 while he was working. This

---

[16]Plaintiff's job as pizza delivery driver ended in September 2003.

[17]This omits the October 2003 GAF score of 25 assessed while Plaintiff was a patient at the VA hospital during a major depressive episode. (TR. 131). Defendant posits that the score may be a typographical error and Plaintiff has not argued otherwise.

[18]A GAF score of 51-60 denotes moderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) or moderate difficulty in social, occupational or school functioning (e.g., few friends, conflicts with peers or co-workers). *DSM-IV*, at p. 32.

1    is true: in September 1999 Plaintiff's GAF score was 50, followed by a score of 65 the
2    following month.  (TR. 329).  Additionally, in June 2003, Plaintiff's GAF score was 50.
3    (*Id.*). In October 2003, after his job ended, Plaintiff presented to the VA hospital with major
4    depression, and thereafter his GAF scores of record remained in the 50's until August 2005.
5    There is no showing on this record that Plaintiff successfully worked while his GAF score
6    consistently remained at 50 for a considerable amount of time; nor did the ALJ rely on such
7    a reason.  *See Orn v. Astrue,* 495 F.3d 625, 630 (9th Cir. 2007)("We review only the reasons
8    provided by the ALJ in the disability determination and may not affirm the ALJ on a ground
9    upon which he did not rely.").

10          The ALJ accepted Dr. Goldberg's rejection of Dr. Clymer's GAF assessment because
11   Dr. Clymer assigned a score of 50 because Plaintiff "'can't work.'" (TR. 21).   In December
12   2006, Dr. Clymer diagnosed PTSD and major depression.  (TR. 138).  He discussed at length
13   in his report Plaintiff's symptoms of PTSD including hyperviligance, discomfort around
14   people, as well as other symptoms of depression.  (TR. 136-38). He also noted adverse
15   effects on Plaintiff's ability to work.  (TR. 137). He assessed a GAF score of 50 because of
16   "serious symptoms, serious impairment in social and occupational function."  (TR. 138).
17   Later in his report, Dr. Clymer stated that he disagreed with Dr. Witek's March 2006 GAF
18   score of 63 because Plaintiff "is unable to work."  (TR. 139).  A plain reading of the GAF
19   scale reflects that  scores ranging from 41-50 include: "serious impairment in social,
20   occupational...functioning (e.g., no friends, *unable to keep a job*)."  DSM-IV, at p.32
21   (emphasis added)).  Dr. Clymer's  own findings were that Plaintiff was seriously impaired
22   in social and occupational function and the GAF score he assessed included the possibility
23   that a party who had such a score would be, unable to work, *i.e.,*  unable to keep a job.  Put
24   a different way, the ALJ has dismissed Dr. Clymer's opinion because Dr. Clymer cited the
25   very criteria from the GAF scale for scores of 41-50 that would support such an opinion. On
26   this record, the ALJ's reason for rejecting Dr. Clymer's assessment is without a legitimate
27   basis.

28          The ALJ also discounted GAF scores ranging from 45-50 because of "the lack of

marked limitations in the medical source statements." (TR. 24).  Although Dr. Yost, Dr. Goldberg and Dr. Taheri found Plaintiff had certain moderate limitations, none found that Plaintiff was markedly limited in any area.[19]  Nonetheless, "GAF scores are of very limited usefulness [in social security cases] due to their failure to translate into concrete functional limitations."  *Phongsuwan v. Astrue,* 2010 WL 796969, at *5 (E.D. Cal. Mar. 5, 2010).  Consequently, there is no basis in the record for the conclusion that GAF scores ranging from 45-50 would necessarily translate into "marked" limitations.

Additionally, non-examining Dr. Goldberg stated in his April 2007 report that Plaintiff was well-groomed and Plaintiff takes issue with this comment given that examining Dr. Yost reported that on December 4, 2006 Plaintiff had overall poor grooming and a homeless appearance.  (Plaintiff's Brief, p. 13 (*citing* TR. 233; *see also* TR. 235 (Dr. Yost saw Plaintiff on December 4, 2006)).  The record reflects that when Plaintiff saw Dr. Clymer on December 28, 2006, Plaintiff was "not untidy in his personal appearance" (TR. 137) and Dr. Goldberg reported that Plaintiff's "dress and grooming are good." (TR. 118).  Using Dr. Goldberg's words verbatim, the ALJ stated in his decision that Plaintiff's "dress and grooming are good...." (TR. 21).  Plaintiff's early medical records reflect that he was well groomed and had good hygiene.  (TR. 312 (March 2005); TR. 308 (April 7, 2005)).  On April 29, 2005, Dr. Gann indicated that Plaintiff looked haggard and fatigued.  (TR. 307).  On May 18, 2005, Dr.

---

[19]Dr. Goldberg opined that Dr. Yost's GAF assessment was "grossly inaccurate..." because the medical source statement had "only 1 mod[erate] limitation!"  (TR. 118) (exclamation point in original).  Dr. Yost actually indicated two moderate limitations: (1) Plaintiff was moderately limited in his ability to complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods; and Plaintiff was moderately limited in the ability to set realistic goals and make plans independently of others. (TR. 237, 238; *see also* TR. 21 (ALJ noting that Dr. Yost indicated two moderate limitations)).  Dr. Goldberg himself assessed six moderate limitations: in addition to the two listed by Dr. Yost, Dr. Goldberg indicated Plaintiff was moderately limited in: the ability to work in coordination or proximity to others without being distracted by them; the ability to interact appropriately with the general public; the ability to accept instructions and respond appropriately to criticism from supervisors; the ability to get along with co-workers or peers without distracting them or exhibiting behavioral extremes.  (TR. 116-17).

Gann reported that Plaintiff was poorly groomed and had poor hygiene, an offensive odor, and an unkempt appearance. (TR. 304-05 (also noting that Plaintiff "appears more depressed and fatigued with every visit.")).   On that same date and on May 20, 2005 Dr. Witek noted Plaintiff's dishevelled appearance.  (TR. 299, 301-03).   Although Plaintiff looked less dishevelled than prior visits on May 25, 2005, by August 2005, he again presented  to Dr. Witek with a dishevelled appearance and he continued with this appearance in November 2005 and March 2006.  (TR. 178, 181, 203, 298).  In November 2006, Dr. Witek reported that Plaintiff's clothes were rumpled, dirty, and his tee-shirt had holes.  (TR. 163).  On December 5, 2006, examining Dr. Yost noted Plaintiff's "[o]verall grooming was poor.  He had a 'homeless' appearance, several teeth missing from his lower jaw and several days beard growth."  (TR. 233). On December 19, 2006, non-examining Dr. Taheri indicated that Plaintiff was approaching a moderate limitation in the ability to maintain socially appropriate behavior and to adhere to basic standards of neatness and cleanliness.  (TR. 229).  Although Plaintiff did not appear "untidy..." to VA Dr. Clymer on December 28, 2006, by February 2007, Dr. Witek reported that Plaintiff's clothing was dirty and rumpled and his tee-shirt had holes. (TR. 137, 148-49).  In May 2007, Dr. Witek indicated that Plaintiff's appearance was slightly neater than before and, in June 2007, Dr. Witek stated that Plaintiff's appearance was neat.  (TR. 406, 411).

In sum, Dr. Goldberg's report and, in turn the ALJ's decision, focused on the most recent of Plaintiff's medical records and, in doing so, ignored consistent GAF assessments among treating doctors and examining Dr. Yost as well other notes of record from treating doctors during the period of claimed disability.[20]  *See Darbritz v. Astrue,* 2008 WL 4382680 (C.D. Cal. Aug. 22, 2008) ("the consistency between [the treating doctor's]...GAF assessments...[and] the other independent GAF assessments in the record..." together with the plaintiff's treatment records undermined the ALJ's rejection of the treating doctor's GAF

---

[20]It might very well be that in 2006-2007, Plaintiff was improving, but that does not necessarily preclude either a finding of disability or a finding of a closed period of disability for 2003-2005, for example, if such were warranted.

assessments).  On the instant record, the ALJ's reasons for rejecting Dr. Yost's and Dr. Clymer's GAF assessments are not based on specific, legitimate reasons supported by substantial record evidence. *See Orn,* 495 F.3d at 630 (a court reviewing an ALJ's conclusions "must consider the entire record as a whole and not affirm simply by isolating a specific quantum of supporting evidence.") (internal quotation marks and citation omitted).

Given the limited value of a GAF score to social security disability determinations, *see e.g., Mann,* 2009 WL 2246350, a GAF score in the range of 45-50 may have little impact on the ultimate disability determination.  This is especially so given that the ALJ found Plaintiff was moderately limited with regard to his ability to work with co-workers, supervisors and the general public.  Plaintiff does not argue that a GAF score in the 45-50 range automatically results in a disability determination.  Nor can he posit such an argument given that the Ninth Circuit has concluded that other claimants with GAF scores lower than or similar to the instant Plaintiff's were not disabled under the Social Security Act. *See Bayliss v. Barnhart,* 427 F.3d 1211, 1217 (9th Cir. 2005) (claimant with a GAF score of 40 was not disabled); *see also Morgan,* 169 F.3d. at 600 (claimant with GAF scores ranging from 45 to 61 was not disabled).  Further, review of Dr. Yost's opinion reflects that he believed Plaintiff was only mildly limited in his abilities to get along with co-workers and peers and to interact with the general public.  It was Dr. Goldberg who found Plaintiff was moderately limited in this area; yet Plaintiff seeks to undermine the ALJ's reliance on Dr. Goldberg's report over Dr. Yost's.  Nevertheless, Dr. Clymer opined that Plaintiff was so limited in his social and occupational functioning that he could not work.  While the ultimate disability decision is that of the ALJ and not the physician, *see Magallanes,* 881 F.2d at 751, the ALJ's failure to cite proper reasons to support adoption of Dr. Goldberg's opinion, places Dr. Clymer's and Dr. Yost's opinions back into play.

### 3.    Plaintiff's credibility

In finding that Plaintiff's statements concerning the intensity, persistence, and limiting effects of his symptoms were not entirely credible, the ALJ cited the following: that Plaintiff stopped working in 2005 not due to his impairments but because the company he worked for

decided to stop delivering pizzas; Plaintiff's symptoms are situational; Plaintiff's ability to engage in a wide range of daily activities including taking public transportation; and Plaintiff's interaction with others in the legal system.  (TR. 23-24).

Plaintiff argues that the ALJ's credibility determination was improper.

When assessing a claimant's credibility, the "ALJ is not required to believe every allegation of disabling pain or other non-exertional impairment."  *Orn,* 495 F.3d at 635 (internal quotation marks and citation omitted). However, where, as here, the claimant has produced objective medical evidence of an underlying impairment that could reasonably give rise to the symptoms and there is no affirmative finding of malingering by the ALJ, the ALJ's reasons for rejecting the claimant's symptom testimony must be specific, clear and convincing.  *Tomasetti v. Astrue*, 533 F.3d 1035 (9th Cir. 2008); *Orn,* 495 F.3d at 635*; Robbins v. Soc. Sec. Admin.,* 466 F.3d 880, 883 (9th Cir. 2006).  Additionally, "[t]he ALJ must state specifically which symptom testimony is not credible and what facts in the record lead to that conclusion." *Smolen v. Chater,* 80 F.3d 1273, 1284 (9th Cir. 1996); *see also Orn,* 495 F.3d at 635 (the ALJ must provide specific and cogent reasons for the disbelief and cite the reasons why the testimony is unpersuasive). In assessing the claimant's credibility, the ALJ may consider ordinary techniques of credibility evaluation, such as the claimant's reputation for lying, prior inconsistent statements about the symptoms, and other testimony from the claimant that appears less than candid; unexplained or inadequately explained failure to seek or follow a prescribed course of treatment; the claimant's daily activities; the claimant's work record; observations of treating and examining physicians and other third parties; precipitating and aggravating factors; and  functional restrictions caused by the symptoms. *Lingenfelter,* 504 F.3d at 1040;  *Smolen,* 80 F.3d at 1284.  *See also Robbins,* 466 F.3d at 884 ("To find the claimant not credible, the ALJ must rely either on reasons unrelated to the subjective testimony (e.g., reputation for dishonesty), on conflicts between his testimony and his own conduct; or on internal contradictions in that testimony.")

a.    That Plaintiff stopped working because his job ended, not because of his impairments

It was proper for the ALJ to cite the fact that Plaintiff did not stop working at his last employment due to disability.  That is a true fact.  Defendant points out that "Plaintiff's depression, anxiety, and PTSD were longstanding impairments, stemming in part from the fact that he was raped while in the military and had to deal with a number of stressful family circumstances in the ensuing years." (Defendant's Opp., p.14).  Defendant also points out that despite Plaintiff's longstanding impairments, he was able to work in his last job as a pizza delivery driver for three years and that Plaintiff acknowledged that he liked the job "'because he essentially was delivering pizza and it was not necessary for him to interact with the public.'" (*Id.* (*quoting* TR. 136-37)).    Defendant cites Plaintiff's statement in October 2003–when, according to VA Dr. Freeman, Plaintiff was "in the midst of his first major depressive episode" (TR. 133)–that "he has been functioning for a long time with his problems and would do well." (Defendant's Opp., p.14 (*quoting* TR. 134)).

Defendant is correct that Plaintiff has repeatedly acknowledged that he stopped working for reasons other than his impairments. (*See* Defendant's Opp., p. 14 (*citing* TR. 132, 137, 233, 435)).    However, Plaintiff posits that his impairments worsened after his pizza delivery job ended in 2003. (*See* Plaintiff's Brief, p.14).  Of particular concern on this issue is the ALJ's statement in his decision that Plaintiff "stopped working in *2005*, not due to his impairments, but because his company stopped delivering pizza." (TR. 23 (emphasis added)).  The record and the parties' respective briefs are clear that Plaintiff last worked in *2003*.  (TR. 86 (Plaintiff last worked as a pizza delivery driver in September 2003); Plaintiff's Brief, p.14; Defendant's Opp., p.2 (*citing* TR. 59, 94)).  Further, two pages earlier in his decision when discussing Plaintiff's eligibility for benefits, the ALJ stated that Plaintiff had not engaged in substantial gainful activity since September 15, 2003, the alleged onset date. (TR. 21).  It is very conceivable that the 2005 date cited by the ALJ might very well be a typographical error.  If the ALJ did believe that Plaintiff last worked in 2005, the impact

of such a mistake is not entirely clear given that few medical records predate 2005.[21] However, the record is clear that in October 2003-approximately one month after Plaintiff quit working, he was hospitalized for two days while "in the midst of his first major depressive episode." (TR. 133).   At that time, Plaintiff cited the following stressors: his sister was raped, his dog died, his common law wife and her child moved away, and his mother having coronary artery surgery. (TR. 131).  Plaintiff stated that his sister's rape "[t]rigger[ed] what happened to me." (TR. 311).  Consistent with his statements to medical personnel, Plaintiff testified at the hearing before the ALJ that he did not look for work after his job delivering pizza ended because "I had an incident with my sister getting in trouble and then I just started getting anxiety attacks more frequently after a family problem." (TR. 435).

Dr. Goldberg stated that Plaintiff "has successfully worked in multiple jobs requiring minimal public contact" (TR. 118) and the ALJ also indicated same in his decision.  (TR. 21("The record shows that the [Plaintiff]... has successfully worked in multiple jobs requiring minimal public contact.")).   Plaintiff has not worked since 2003 and he argues that his condition worsened after that time. (*See* Plaintiff's Brief, p. 14).

That Plaintiff was suffering from PTSD/depression prior to September 2003 is not disputed. (*See Id.; see also* Defendant's Opp., p.2; TR. 133 (Dr. Freeman noting in October 2003 that Plaintiff had been experiencing some depression for the past two years)).  Thus, it is presumed that Plaintiff had a pre-existing diagnosis of PTSD/depression during all or some of the time period that he was working.[22]  Moreover, in October 2003, when Plaintiff was diagnosed with his first major depressive episode, Dr. Freeman opined at that time that "[i]t was likely that the depression he was experiencing over the past 2 years has been

---

[21]If the ALJ's statement was not a typographical error, then the mistaken belief that Plaintiff last worked in 2005 may explain why the ALJ focused on Plaintiff's medical records and history for "the past year..." (TR. 21), *see* discussion, *supra,* at III.C.2.

[22]At some point prior to the ALJ's decision the VA awarded Plaintiff a 50% disability rating based on Plaintiff's PTSD "also claimed as depression." (*See* TR 11).

dysthymia that was precipitated by the loss of his 'daughter.' His current depression is superimposed on the dysthymia, otherwise known as 'double depression.'" (TR. 133). From this point forward, the medical record is scant until 2005, showing only GAF scores of 50 in September 2004, and 55 in May and November 2004. (TR. 313). The first medical record from 2005 reflects Plaintiff's complaints of depression and frequent panic attacks, and Dr. Gann diagnosed PTSD, major depression, panic disorder and growing isolation. (*Id.*). Plaintiff's records through 2007 reflect diagnoses of PTSD and depression.

The ALJ certainly may consider the fact that a claimant was able to work while suffering from impairments that the claimant now alleges render him or her disabled. *See Bray v. Astrue,* 554 F.3d 1219, 1227 (9th Cir. 2009)(discounting claimant's credibility where, *inter alia,* the claimant had recently worked for two years and had sought out other employment since then despite her symptoms of shortness of breath and chemical sensitivity); *Gregory v. Bowen,* 844 F.2d 664, 666-67 (9th Cir. 1988) (noting that the claimant's back condition "had remained constant for a number of years and that her back problems had not prevented her from working over that time."). The difference here, however, is that there is no evidence of record that Plaintiff worked while experiencing the degree of symptoms he complains of or that he worked after their alleged onset. Moreover, given the onset of his "double depression" in October 2003, the record does not support the conclusion that Plaintiff's condition remained constant during the relevant time period.

The fact that Plaintiff stopped working because his job ended was properly considered by the ALJ. However, to any extent that the ALJ relied on same to conclude that Plaintiff worked while experiencing the same degree of symptoms he now claims render him disabled, such conclusion is not supported by the record.

<u>b.      That Plaintiff's symptoms are situational</u>

Plaintiff points out that Dr. Clymer documented his "PTSD and depression symptoms as follows: amnesia for military sexual trauma, difficulty falling asleep; discomfort in social settings; hyper vigilance [sic]; constantly on the alert; startle effect; poor concentration; irritability; poor appetite; tearfulness; low self-esteem; lack of energy; and lack of interest

in things.   ([TR.] 136-137).   Other stressors included the time of year–his sister's death–problems with the legal system and his dog, being in public places or in isolated situations with a male. ([TR.] 131, 136, 162-163, 406-413)."  (Plaintiff's Brief, p. 18). Plaintiff argues that such "situational symptoms were typical for his disability and were not an indication of lack of credibility on his part."  (*Id.*).   Plaintiff's argument is well-taken.

Defendant counters that "the situational nature of an impairment may indicate that the impairment was not disabling for 12 consecutive months, or was likely to improve within 12 months as the situation changed."  (Defendant's Opp., p.18).  The converse is also true as well, given that "[t]he critical issue in a disability case is the claimant's 'capacity for work activity on a *regular and continuing basis.*'" *Irwin v. Shalala,* 840 F.Supp. 751, 763 (D. Or. 1993) *(quoting* 20 C.F.R. § 404.1545(b)) (emphasis in original).  Thus, "[w]here it is established that the claimant can hold a job for only a short period of time, the claimant is not capable of substantial gainful activity." *Gatliff v. Commissioner of Social Security Admin.,* 172 F.3d 690, 694 (9th Cir. 1999) (no substantial gainful employment where plaintiff is unable to hold a job for more than 2 months at a time).  "Occasional symptom-free periods–and even the sporadic ability to work–are not inconsistent with disability." *Lester,* 81 F.3d at 833.

The difficulty with the ALJ's dismissal of Plaintiff's symptoms as situational is that as late as March 2006, Dr. Witek wrote that Plaintiff was still struggling to stabilize his life (TR. 179), in May 2006 Dr. Witek wrote that Plaintiff "[c]ontinued to be symptomatic. Litany of stressors"  (TR. 176), and by June 2007 Dr. Witek noted the chronicity of Plaintiff's symptoms (TR. 407-08).  Moreover, records from 2005 through 2007 document Plaintiff's continued complaints of panic attacks, difficulty sleeping, growing isolation, despondence, feeling unsafe, loss of appetite resulting in weight loss, and, at times, unkempt appearance.  During this time period, his dog's death left him feeling vulnerable without the dog's protection while he slept, his missing brother was found dead and Plaintiff had to identify the body, his sister attempted suicide, his home was burglarized and the burglar held him at gunpoint and then struck him over the head, he got into legal trouble driving on a

suspended license, he had to serve jail time which resulted in panic attacks, his new dog was impounded as a dangerous animal which rendered Plaintiff angry and upset to such a degree that at one point Dr. Witek requested a care coordinator call to check on Plaintiff the next evening. The record suggests a continuum of "situational" stressors in Plaintiff's life affecting Plaintiff's ability to cope in a way that allows him to effectively move forward with daily life and work on a regular and continuing basis as opposed to isolated, sporadic events not affecting Plaintiffs' capacity to work on a regular and continuing basis as opined by Defendant.

Upon consideration of the evidence of record, the ALJ's reference to Plaintiff's depression and anxiety as "situational" does not serve as a clear and convincing reason to undercut Plaintiff's credibility regarding the intensity, persistence and limiting effects of his symptoms.

### c.   Plaintiff's daily activities

The ALJ discounted Plaintiff's credibility, in part, because Plaintiff

> reports a wide range of daily activities, such as making breakfast for his mother, gardening, watching television, cooking, laundry, shopping, and cleaning. He reports that he gets nervous when he leaves his house, but the record indicates that he takes public transportation to his medical appointments without any difficulty and otherwise performs his daily activities.

(TR. 23-24). Plaintiff argues that he only exhibited a full range of daily activities at his home, which is consistent with his symptoms. (Plaintiff's Brief, p.17). Plaintiff points out that in evaluating a claimant's symptoms, the Commissioner is to consider "[a]ny measures you use or have used to relieve your pain or other symptoms (e.g., lying flat on your back, standing for 15 to 20 minutes every hour, sleeping on a board, etc.)...." 20 C.F.R. §404.1529(c)(3)(vi); (*see also* Plaintiff's Brief, p.17). Plaintiff asserts that staying at home is how he relieves his symptoms. (Plaintiff's Brief, p. 17).

The Ninth Circuit has "repeatedly asserted that the mere fact that a plaintiff has carried on certain daily activities such as grocery shopping, driving a car, or limited walking for exercise, does not in any way detract from her credibility as to her overall disability. One does not need to be 'utterly incapacitated' in order to be disabled." *Vertigan v. Halter,* 260

F.3d 1044, 1050 (9th Cir. 2001) (*quoting Fair v. Bowen,* 885 F.2d 597, 603 (9th Cir. 1989));

*see also Fair,* 885 F.2d at 603 ("[M]any home activities are not easily transferable to what

may be the more grueling environment of the work place...."); *Vick v. Commissioner of the*

*Social Security Admin.*, 57 F.Supp.2d 1077, 1086 (D. Or. 1999) ("[i]f a claimant's activity

is in harmony with her disability, the activity does not necessarily indicate an ability to

work."). The question is whether the plaintiff spends a "'substantial part of his day engaged

in pursuits involving the performance of physical functions that are transferrable to a work

setting....' Thus, if a claimant is capable of performing activities including household chores,

'that involve many of the same physical tasks as a particular type of job, it would not be

farfetched for an ALJ to conclude that the claimant's pain does not prevent the claimant from

working.'" *Vick,* 57 F.Supp.2d at 1085-86 (*quoting Fair,* 885 F.2d at 602)(emphasis in

original); *see also Morgan,* 169 F.3d at 600 (same).

Plaintiff has not claimed physical limitations. That he is able to function within his

home is entirely consistent with claimed anxiety attacks and other mental/emotional

symptoms occurring when he leaves his home. As for the ALJ's finding that Plaintiff went

to the grocery store, Plaintiff stated that he avoided going to the grocery store unless he

"absolutely..." had to. (TR. 436). Likewise, although the ALJ stated that Plaintiff takes

public transportation to medical appointments "without difficulty..." (TR. 23), the record

reflects  Plaintiff's statement to Dr. Clymer in 2006 that when he rides the bus he is

constantly on alert.[23] (TR. 136). Hence, Plaintiff does experience symptoms while riding

the bus.

Defendant cites other instances of Plaintiff's conduct, such as going to a bar or on a

trip with his sister, to substantiate the ALJ's credibility decision. (Defendant's Opp., p.17).

The law is well-settled that this Court is "constrained to review the reasons the ALJ asserts"

in his decision for discounting a claimant's credibility. *See Connett,* 340 F.3d at 874. *See*

---

[23]Dr. Clymer's report reflects: "There is some degree of hypervigilance.  He is
uncomfortable in crowds and states that for example when riding the bus he is constantly on
the alert."  (TR. 136).

*also Orn,* 495 F.3d at 630 ("We review only the reasons provided by the ALJ in the disability determination and may not affirm the ALJ on a ground upon which he did not rely.").

### d.    Plaintiff's interaction with others in the legal system

The ALJ stated:

> While the claimant has some difficulty interacting with others, this limitation has been incorporated into the residual functional capacity set forth above. The limitation is not severe, as evidenced by the claimant's interaction with others in the legal system.

(TR. 24; *see also* TR. 22 (ALJ's finding that Plaintiff is "moderately limited in his abilities to work with co-workers, supervisors, and the general public.")).  Plaintiff argues that the evidence of record is to the contrary.  (Plaintiff's Brief, pp. 17-18).  Defendant contends that "[o]ne can reasonably infer that the fact Plaintiff engaged in at least brief contact with multiple individuals on a regular basis demonstrated that his anxiety was not markedly debilitating so as to preclude him from working in a job with only brief, superficial contact with others, such as a pizza delivery driver."  (Defendant's Opp., pp. 17-18).

The actual evidence of Plaintiff's interaction with others in the legal system is scant and the ALJ has not specified the interactions relied upon.  The record reflects that Plaintiff had some criminal legal issues.  Plaintiff mentioned to Dr. Witek in 2005 that he had a public defender and Plaintiff told Dr. Witek that he felt his citation for DUI was improper because he was not intoxicated and that he had filed a complaint against the citing officer.  (TR. 180-81).  When Plaintiff reported for weekend jail incarceration in 2005, "he had a panic attack." (TR. 184).  He also took more Trazodone than prescribed hoping he could sleep through the weekend, but he was refused admittance to the jail because of his reaction to the overdosage. (TR. 180 ("Says was sent home when reported to jail as was told 'you cannot be hopped up on drugs.'")).  Plaintiff then requested that Dr. Witek write a letter requesting home incarceration, which Dr. Witek did citing Plaintiff's PTSD and depressive disorder.  (TR. 183-84).  The letter was to no avail.  (TR. 177).  Plaintiff ultimately served five days in jail. (*Id.*).  He reported that he could not sleep during that time and he experienced "'two bad panic attacks,' etc."  (*Id.*).

In November 2006, Plaintiff returned to Dr. Witek stating that he was "really depressed." (TR. 162). He had spent two nights in jail, his dog had been reported as a dangerous animal, and he had filed for SSDI, but he had a conflict with his case manager. (TR. 162-63). Plaintiff's clothes were rumpled, dirty and had holes. (TR. 163). Plaintiff appeared thin. (*Id.*).

In 2006, Plaintiff mentioned to Dr. Witek that he had an upcoming court appearance for a driving infraction. (TR. 175). Dr. Witek noted that Plaintiff was "[n]ot doing well." (*Id.*).

In February 2007, Plaintiff presented to Dr. Witek very upset and worried because his dog had been impounded as a dangerous animal and he felt that he had been dealt with unfairly. (TR. 148-49). He also mentioned that he had a public defender. (TR. 148). His clothes were dirty and he had holes in his tee shirt. (TR. 149). Through 2007, Plaintiff continued to remain focused on the dog situation and the sense of being dealt with unfairly. (TR. 406-07, 410-11, 413).

There is nothing in the record to support or detract from the ALJ's finding concerning Plaintiff's ability to interact with his public defender. Plaintiff did feel that he had been dealt with unfairly by the police officer who cited him, his case manager, and those involved with impounding his dog. Further, Plaintiff became consumed with the situation involving his dog. Additionally, Plaintiff experienced panic attacks when he had to present at the jail and serve time. Plaintiff asserts that "[i]n actuality, the legal system was probably among the 'litany of stressors' Dr. Witek mentioned." (Plaintiff's Brief, p.18). The fact that Plaintiff had some limited interaction with others in the legal system does not on the instant record constitute a clear and convincing reason to discount Plaintiff's credibility.

e.    Conclusion

In sum, the ALJ failed to cite clear and convincing reasons to discount Plaintiff's credibility.

1

### 4.    Lay testimony from Plaintiff's brother

The ALJ rejected the statement from Plaintiff's brother, Mr. Chariton, because Mr. Chariton lacked medical training which made the accuracy of his statements questionable and because, "by virtue of his relationship to the claimant, the witness cannot be considered a disinterested third party witness whose testimony would not tend to be colored by affection for the claimant and a natural tendency to agree with the symptoms and limitations the claimant alleges." (TR. 24). Plaintiff argues that both reasons are improper. (Plaintiff's Brief, pp. 18-20). Defendant concedes that it was improper for the ALJ to discount Mr. Chariton's statement based on lack of medical training but argues that the ALJ could discount the statement on the basis of bias. (Defendant's Opp., pp. 18-20).

Lay testimony as to a claimant's symptoms is competent evidence which the ALJ must take into account unless he expressly determined to disregard such testimony, in which case he must give reasons that are germane to each witness. *Nguyen v. Chater*, 100 F.3d 1462, 1467 (9th Cir.  1996) (citing *Dodrill v. Shalala*, 12 F.3d 915, 919 (9th Cir. 1993)). In finding error when an ALJ rejected lay testimony from family witnesses because they were "'understandably advocates, and biased'", the Ninth Circuit stated that "the same could be said of any family member who testified in any case.  The fact that a lay witness is a family member cannot be a ground for rejecting his or her testimony.  To the contrary, testimony from lay witnesses who see the claimant every day is of particular value, *see Dodrill*, 12 F.3d at 919, ('[a]n eyewitness can often tell whether someone is suffering or merely malingering...this is particularly true of witnesses who view the claimant on a daily basis...'); such lay witnesses will often be family members." *Smolen*, 80 F.3d at 1289.  *See also Regennitter v. Commissioner of Social Security Admin.*, 166 F.3d 1294, 1298 (9th Cir. 1999) (same).

Defendant cites *Greger v. Barnhart*, 464 F.3d 968 (9th Cir. 2006), where the  Ninth Circuit upheld rejection of lay testimony when "the ALJ found that [the witness's]... "'statements are inconsistent with [claimant's]...presentation to treating physicians during the period at issue, and with [claimant's]...failure to participate in cardiac rehabilitation.'

The ALJ also considered [the witness's]...'close relationship' with [claimant]..., and that she was possibly 'influenced by her desire to help [him].'" *Greger,* 464 F.3d at 972. The *Greger* court held that the ALJ's reasons for doubting the lay testimony were germane to the witness and, thus, there was no error. *Id.* at 972-73.

Defendant does not argue that *Smolen* has been overturned on this issue. Moreover, in *Greger,* the ALJ provided a sufficient reason for rejecting the lay testimony that did not involve bias. In the instant case, there was no mention of inconsistencies between the lay witness and claimant testimony, or that the lay witness statement mirrored that of the claimant, or any number of signs that the lay witness was unreliable. (*See* Plaintiff's Reply, p.4). The ALJ's rejection of Mr. Chariton's testimony solely on the basis of bias cannot stand.

The Ninth Circuit has "held...that 'where the ALJ's error lies in a failure to properly discuss competent lay testimony favorable to the claimant, a reviewing court cannot consider the error harmless unless it can confidently conclude that no reasonable ALJ, when fully crediting the testimony, could have reached a different disability determination.'" *Robbins,* 466 F.3d at 885 (noting that the Ninth Circuit has never found harmless, silent disregard of lay testimony about how an impairment limits a claimant's ability to work) (*citing Stout v. Commissioner,* 454 F.3d 1050, 1056) (9th Cir. 2006)). Defendant argues that any error is harmless because the ALJ did not silently disregard the lay evidence. (Defendant's Opp., p. 19). Herein, the ALJ's rejection of such testimony based on improper reasons equates to silent disregard because, in essence, the ALJ has not stated a sufficient reason to reject it.

Plaintiff concedes that the ALJ's decision "correctly stated that lay witness testimony does not establish disability...." (Plaintiff's Brief, p. 19). Mr. Chariton's statements indicate limitations that were more severe than found by the ALJ.

Clearly, the determination of whether a claimant meets the statutory definition of disability is a legal conclusion reserved to the Commissioner. *See* 20 C.F.R. § 404.1527(e); *see also Nguyen,* 100 F.3d at 1467 (medical diagnoses are beyond the competence of lay witnesses). Nonetheless, this Court cannot confidently say that, fully crediting Mr.

Chariton's lay opinion, the ALJ would have arrived at the same RFC determination and/or the same ultimate disability determination. *See Nguyen,* 100 F.3d at 1467 ("lay witness testimony as to a claimant's symptoms or how an impairment affects ability to work *is* competent evidence...")(emphasis in original).  The error is not harmless.

### 5.    Remand

Plaintiff requests that the Court either "reverse without remand for a rehearing...as there is substantial evidence to show that he was unable to return to past relevant work..." or "remand for a rehearing, to proceed to Step 5,...as there is substantial evidence to show that he was unable to return to his past relevant work."  (Plaintiff's Reply, p.4).  The Court construes Plaintiff's first request as a request for remand for award of benefits.

"'[T]he decision whether to remand the case for additional evidence or simply to award benefits is within the discretion of the court.'" *Rodriguez v. Bowen,* 876 F.2d 759, 763 (9th Cir. 1989) (*quoting Stone v. Heckler,* 761 F.2d 530, 533 (9th Cir. 1985)). "Remand for further administrative proceedings is appropriate if enhancement of the record would be useful." *Benecke v. Barnhart,* 379 F.3d 587, 593, (9th Cir. 2004) (*citing Harman,* 211 F.3d at 1178).  Conversely, remand for an award of benefits is appropriate where:

> (1) the ALJ failed to provide legally sufficient reasons for rejecting the evidence; (2) there are no outstanding issues that must be resolved before a determination of disability can be made; and (3) it is clear from the record that the ALJ would be required to find the claimant disabled were such evidence credited.

*Benecke,* 379 F.3d at 593(citations omitted).   Where the test is met, "we will not remand solely to allow the ALJ to make specific findings....Rather, we take the relevant testimony to be established as true and remand for an award of benefits." *Id.* (citations omitted); *see also Lester,* 81 F.3d at 834.

The ALJ herein was not faced with an easy task.  The record is scant regarding Plaintiff's condition prior to the alleged onset date.  Nonetheless, the ALJ must state legally sufficient reasons for his decision, and on the instant record, that burden has not been satisfied.  Yet, even upon consideration of Dr. Yost's and Dr. Clymer opinions, Mr. Chariton's testimony, and Plaintiff's statements, it is not "clear from the record that the ALJ

would be required to find the claimant disabled were such evidence credited." *Benecke,* 379 F.3d at 593.  Plaintiff's ability to work before the alleged onset date was used as a factor against him even though there was no transparent attempt to assess whether his condition worsened after the alleged onset date.  Further, it is unclear whether the ALJ operated under the misconception that Plaintiff last worked in 2005, thereby suggesting that the October 2003 through 2005 medical records pertained to the time when Plaintiff was working, when, in fact, he was not working during that time.  Moreover, although Plaintiff stated that delivering pizzas did not involve interaction with the public, that job does require Plaintiff to interact with individuals every instance he delivers a pizza.  This begs the question whether that occupation is suitable for one with limitations dealing with the public.  Even if the ALJ were to conclude that Plaintiff was unable to return to his past work, the ALJ is still entitled to proceed to step five to determine whether Plaintiff can perform other work.  It may well be that vocational testimony will be required on the issue whether Plaintiff is able to return to his past work and/or perform other work in the national economy.

Because the record is not clear, at this point, that Plaintiff is entitled to an award of benefits, remand for further proceedings is appropriate.

**IV.   CONCLUSION**

For the foregoing reasons, remand for further proceedings is necessary for proper consideration of: Plaintiff's treating and examining physicians' opinions; Plaintiff's credibility; Mr. Chariton's testimony; and testimony from a vocational expert if necessary, as well as clarification regarding the ALJ's consideration of the 50% VA Disability Rating.[24] The ALJ is instructed to take whatever further action is deemed appropriate and consistent with this decision.  Accordingly,

IT IS ORDERED that the Commissioner's final decision in this matter is REMANDED for further proceedings consistent with this Order. The Clerk of Court is

---

[24]Such evaluation of the record on remand must take into consideration that Plaintiff last worked in 2003, not 2005, or state a valid reason why that is not the case.

instructed to enter judgment accordingly and close this case.

DATED this 29th day of September, 2010.

_____

Héctor C. Estrada
United States Magistrate Judge